EXHIBIT 1

DECL OF GARY R. GLEASON IN
SUPP. OF DEF.'S MTN TO DISMISS
STATE LAW CLAIMS

APPENDIX A(1) TO PART 61

FEDERAL EMERGENCY MANAGEMENT AGENCY,
FEDERAL INSURANCE ADMINISTRATION

STANDARD FLOOD INSURANCE POLICY

DWELLING FORM

Please read the policy carefully. The flood insurance provided is subject to limitations, restrictions, and exclusions. This policy covers only:

1. A non-condominium residential building designed for principal use as a dwelling place of one to four families, or

2. A single family dwelling unit in a condominium building.

I. AGREEMENT

The Federal Emergency Management Agency (FEMA) provides flood insurance under the terms of the National Flood Insurance Act of 1968 and its Amendments, and Title 44 of the Code of Federal Regulations.

We will pay you for direct physical loss by or from flood to your insured property if you:

1. Have paid the correct premium;

2. Comply with all terms and conditions of this policy; and

3. Have furnished accurate information and statements.

We have the right to review the information you give us at any time and to revise your policy based on our review.

II. DEFINITIONS

A. In this policy, "you" and "your" refer to the insured(s) shown on the Declarations Page of this policy and your spouse, if a resident of the same household. Insured(s) includes: Any mortgagee and loss payee named in the Application and Declarations Page, as well as any other mortgagee or loss payee determined to exist at the time of loss in the order of precedence. "We," "us," and "our" refer to the insurer.

Some definitions are complex because they are provided as they appear in the law or regulations, or result from court cases. The precise definitions are intended to protect you.

*Flood,* as used in this flood insurance policy, means:

1. A general and temporary condition of partial or complete inundation of two or more acres of normally dry land area or of two or more properties (one of which is your property) from:

a. Overflow of inland or tidal waters,

b. Unusual and rapid accumulation or run-off of surface waters from any source,

c. Mudflow.

2. Collapse or subsidence of land along the shore of a lake or similar body of water as a result of erosion or undermining caused by

waves or currents of water exceeding anticipated cyclical levels that result in a flood as defined in A.1.a. above.

B. The following are the other key definitions we use in this policy:

1. *Act.* The National Flood Insurance Act of 1968 and any amendments to it.

2. *Actual Cash Value.* The cost to replace an insured item of property at the time of loss, less the value of its physical depreciation.

3. *Application.* The statement made and signed by you or your agent in applying for this policy. The application gives information we use to determine the eligibility of the risk, the kind of policy to be issued, and the correct premium payment. The application is part of this flood insurance policy. For us to issue you a policy, the correct premium payment must accompany the application.

4. *Base Flood.* A flood having a one percent chance of being equaled or exceeded in any given year.

5. *Basement.* Any area of the building, including any sunken room or sunken portion of a room, having its floor below ground level (subgrade) on all sides.

6. *Building.*

a. A structure with two or more outside rigid walls and a fully secured roof, that is affixed to a permanent site;

b. A manufactured home (a "manufactured home," also known as a mobile home, is a structure: built on a permanent chassis, transported to its site in one or more sections, and affixed to a permanent foundation); or

c. A travel trailer without wheels, built on a chassis and affixed to a permanent foundation, that is regulated under the community's floodplain management and building ordinances or laws.

*Building* does not mean a gas or liquid storage tank or a recreational vehicle, park trailer or other similar vehicle, except as described in B.6.c. above.

7. *Cancellation.* The ending of the insurance coverage provided by this policy before the expiration date.

8. *Condominium.* That form of ownership of real property in which each unit owner has an undivided interest in common elements.

9. *Condominium Association.* The entity made up of the unit owners responsible for the maintenance and operation of:

a. Common elements owned in undivided shares by unit owners; and

b. Other real property in which the unit owners have use rights; where membership in the entity is a required condition of unit ownership.

10. *Declarations Page.* A computer-generated summary of information you provided in the application for insurance. The Declarations Page also describes the term of the policy, limits of coverage, and displays the

premium and our name. The Declarations Page is a part of this flood insurance policy.

11. *Described Location.* The location where the insured building(s) or personal property are found. The described location is shown on the Declarations Page.

12. *Direct Physical Loss By or From Flood.* Loss or damage to insured property, directly caused by a flood. There must be evidence of physical changes to the property.

13. *Dwelling.* A building designed for use as a residence for no more than four families or a single-family unit in a building under a condominium form of ownership.

14. *Elevated Building.* A building that has no basement and that has its lowest elevated floor raised above ground level by foundation walls, shear walls, posts, piers, pilings, or columns.

15. *Emergency Program.* The initial phase of a community's participation in the National Flood Insurance Program. During this phase, only limited amounts of insurance are available under the Act.

16. *Expense Constant.* A flat charge you must pay on each new or renewal policy to defray the expenses of the Federal Government related to flood insurance.

17. *Federal Policy Fee.* A flat charge you must pay on each new or renewal policy to defray certain administrative expenses incurred in carrying out the National Flood Insurance Program. This fee covers expenses not covered by the Expense Constant.

18. *Improvements.* Fixtures, alterations, installations, or additions comprising a part of the insured dwelling or the apartment in which you reside.

19. *Mudflow.* A river of liquid and flowing mud on the surface of normally dry land areas, as when earth is carried by a current of water. Other earth movements, such as landslide, slope failure, or a saturated soil mass moving by liquidity down a slope, are not mudflows.

20. *National Flood Insurance Program (NFIP).* The program of flood insurance coverage and floodplain management administered under the Act and applicable Federal regulations in Title 44 of the Code of Federal Regulations, Subchapter B.

21. *Policy.* The entire written contract between you and us. It includes:

a. This printed form;

b. The application and Declarations Page;

c. Any endorsement(s) that may be issued; and

d. Any renewal certificate indicating that coverage has been instituted for a new policy and new policy term.

Only one dwelling, which you specifically described in the application, may be insured under this policy.

22. *Pollutants.* Substances that include, but are not limited to, any solid, liquid, gaseous, or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis,

chemicals, and waste. "Waste" includes, but is not limited to, materials to be recycled, reconditioned, or reclaimed.

23. *Post-FIRM Building.* A building for which construction or substantial improvement occurred after December 31, 1974, or on or after the effective date of an initial Flood Insurance Rate Map (FIRM), whichever is later.

24. *Probation Premium.* A flat charge you must pay on each new or renewal policy issued covering property in a community the NFIP has placed on probation under the provisions of 44 CFR 59.24.

25. *Regular Program.* The final phase of a community's participation in the National Flood Insurance Program. In this phase, a Flood Insurance Rate Map is in effect and full limits of coverage are available under the Act.

26. *Special Flood Hazard Area.* An area having special flood or mudflow, and/or flood-related erosion hazards, and shown on a Flood Hazard Boundary Map or Flood Insurance Rate Map as Zone A, AO, A1–A30, AE, A99, AH, AR, AR/A, AR/AE, AR/AH, AR/AO, AR/A1–A30, V1–V30, VE, or V.

27. *Unit.* A single-family unit you own in a condominium building.

28. *Valued Policy.* A policy in which the insured and the insurer agree on the value of the property insured, that value being payable in the event of a total loss. The Standard Flood Insurance Policy is not a valued policy.

III. PROPERTY COVERED

*A. Coverage A—Building Property*

We insure against direct physical loss by or from flood to:

1. The dwelling at the described location, or for a period of 45 days at another location as set forth in III.C.2.b., Property Removed to Safety.

2. Additions and extensions attached to and in contact with the dwelling by means of a rigid exterior wall, a solid load-bearing interior wall, a stairway, an elevated walkway, or a roof. At your option, additions and extensions connected by any of these methods may be separately insured. Additions and extensions attached to and in contact with the building by means of a common interior wall that is not a solid load-bearing wall are always considered part of the dwelling and cannot be separately insured.

3. A detached garage at the described location. Coverage is limited to no more than 10% of the limit of liability on the dwelling. Use of this insurance is at your option but reduces the building limit of liability. We do not cover any detached garage used or held for use as residential (i.e., dwelling), business, or farming purposes.

4. Materials and supplies to be used for construction, alteration, or repair of the

dwelling or a detached garage while the materials and supplies are stored in a fully enclosed building at the described location or on an adjacent property.

5. A building under construction, alteration, or repair at the described location.

a. If the structure is not yet walled or roofed as described in the definition for building (see II.B.6.a.) then coverage applies:

(1) Only while such work is in progress; or

(2) If such work is halted, only for a period of up to 90 continuous days thereafter.

b. However, coverage does not apply until the building is walled and roofed if the lowest floor, including the basement floor, of a non-elevated building or the lowest elevated floor of an elevated building is:

(1) Below the base flood elevation in Zones AH, AE, A1–A30, AR, AR/AE, AR/AH, AR/A1–A30, AR/A, AR/AO; or

(2) Below the base flood elevation adjusted to include the effect of wave action in Zones VE or V1–V30.

The lowest floor levels are based on the bottom of the lowest horizontal structural member of the floor in Zones VE or V1–V30 and the top of the floor in Zones AH, AE, A1–A30, AR, AR/AE, AR/AH, AR/A1–A30, AR/A, AR/AO.

6. A manufactured home or a travel trailer as described in the Definitions section (see II.B.6.b. and II.B.6.c.).

If the manufactured home or travel trailer is in a special flood hazard area, it must be anchored in the following manner at the time of the loss:

a. By over-the-top or frame ties to ground anchors; or

b. In accordance with the manufacturer's specifications; or

c. In compliance with the community's floodplain management requirements unless it has been continuously insured by the NFIP at the same described location since September 30, 1982.

7. The following items of property which are covered under Coverage A only:

a. Awnings and canopies;

b. Blinds;

c. Built-in dishwashers;

d. Built-in microwave ovens;

e. Carpet permanently installed over unfinished flooring;

f. Central air conditioners;

g. Elevator equipment;

h. Fire sprinkler systems;

i. Walk-in freezers;

j. Furnaces and radiators;

k. Garbage disposal units;

l. Hot water heaters, including solar water heaters;

m. Light fixtures;

n. Outdoor antennas and aerials fastened to buildings;

o. Permanently installed cupboards, bookcases, cabinets, paneling, and wallpaper;

p. Plumbing fixtures;

q. Pumps and machinery for operating pumps;

r. Ranges, cooking stoves, and ovens;

s. Refrigerators; and

t. Wall mirrors, permanently installed.

8. Items of property in a building enclosure below the lowest elevated floor of an elevated post-FIRM building located in Zones A1–A30, AE, AH, AR, AR/A, AR/AE, AR/AH, AR/A1–A30, V1–V30, or VE, or in a basement, regardless of the zone. Coverage is limited to the following:

a. Any of the following items, if installed in their functioning locations and, if necessary for operation, connected to a power source:

(1) Central air conditioners;

(2) Cisterns and the water in them;

(3) Drywall for walls and ceilings in a basement and the cost of labor to nail it, unfinished and unfloated and not taped, to the framing;

(4) Electrical junction and circuit breaker boxes;

(5) Electrical outlets and switches;

(6) Elevators, dumbwaiters and related equipment, except for related equipment installed below the base flood elevation after September 30, 1987;

(7) Fuel tanks and the fuel in them;

(8) Furnaces and hot water heaters;

(9) Heat pumps;

(10) Nonflammable insulation in a basement;

(11) Pumps and tanks used in solar energy systems;

(12) Stairways and staircases attached to the building, not separated from it by elevated walkways;

(13) Sump pumps;

(14) Water softeners and the chemicals in them, water filters, and faucets installed as an integral part of the plumbing system;

(15) Well water tanks and pumps;

(16) Required utility connections for any item in this list; and

(17) Footings, foundations, posts, pilings, piers, or other foundation walls and anchorage systems required to support a building.

b. Clean-up.

*B. Coverage B—Personal Property*

1. If you have purchased personal property coverage, we insure against direct physical loss by or from flood to personal property inside a building at the described location, if:

a. The property is owned by you or your household family members; and

b. At your option, the property is owned by guests or servants.

Personal property is also covered for a period of 45 days at another location as set forth in III.C.2.b., Property Removed to Safety.

Personal property in a building that is not fully enclosed must be secured to prevent flotation out of the building. If the personal

**Federal Emergency Management Agency, DHS**          **Pt. 61, App. A(1)**

property does float out during a flood, it will be conclusively presumed that it was not reasonably secured. In that case there is no coverage for such property.

2. Coverage for personal property includes the following property, subject to B.1. above, which is covered under Coverage B only:

a. Air conditioning units, portable or window type;

b. Carpets not permanently installed, over unfinished flooring;

c. Carpets over finished flooring;

d. Clothes washers and dryers;

e. "Cook-out" grills;

f. Food freezers, other than walk-in, and food in any freezer; and

g. Portable microwave ovens and portable dishwashers.

3. Coverage for items of property in a building enclosure below the lowest elevated floor of an elevated post-FIRM building located in Zones A1–A30, AE, AH, AR, AR/A, AR/AE, AR/AH, AR/A1–A30, V1–V30, or VE, or in a basement, regardless of the zone, is limited to the following items, if installed in their functioning locations and, if necessary for operation, connected to a power source:

a. Air conditioning units, portable or window type;

b. Clothes washers and dryers; and

c. Food freezers, other than walk-in, and food in any freezer.

4. If you are a tenant and have insured personal property under Coverage B in this policy, we will cover such property, including your cooking stove or range and refrigerator. The policy will also cover improvements made or acquired solely at your expense in the dwelling or apartment in which you reside, but for not more than 10% of the limit of liability shown for personal property on the Declarations Page. Use of this insurance is at your option but reduces the personal property limit of liability.

5. If you are the owner of a unit and have insured personal property under Coverage B in this policy, we will also cover your interior walls, floor, and ceiling (not otherwise covered under a flood insurance policy purchased by your condominium association) for not more than 10% of the limit of liability shown for personal property on the Declarations Page. Use of this insurance is at your option but reduces the personal property limit of liability.

6. Special Limits. We will pay no more than $2,500 for any one loss to one or more of the following kinds of personal property:

a. Artwork, photographs, collectibles, or memorabilia, including but not limited to, porcelain or other figures, and sports cards;

b. Rare books or autographed items;

c. Jewelry, watches, precious and semi-precious stones, or articles of gold, silver, or platinum;

d. Furs or any article containing fur which represents its principal value; or

e. Personal property used in any business.

7. We will pay only for the functional value of antiques.

*C. Coverage C—Other Coverages*

1. *Debris Removal.*

a. We will pay the expense to remove non-owned debris that is on or in insured property and debris of insured property anywhere.

b. If you or a member of your household perform the removal work, the value of your work will be based on the Federal minimum wage.

c. This coverage does not increase the Coverage A or Coverage B Limit of Liability.

2. *Loss Avoidance Measures*

a. Sandbags, Supplies, and Labor

(1) We will pay up to $1,000 for costs you incur to protect the insured building from a flood or imminent danger of flood, for the following:

(a) Your reasonable expenses to buy:

(i) Sandbags, including sand to fill them;

(ii) Fill for temporary levees;

(iii) Pumps; and

(iv) Plastic sheeting and lumber used in connection with these items.

(b) The value of work, at the Federal minimum wage, that you or a member of your household perform.

(2) This coverage for Sandbags, Supplies and Labor only applies if damage to insured property by or from flood is imminent and the threat of flood damage is apparent enough to lead a person of common prudence to anticipate flood damage. One of the following must also occur:

(a) A general and temporary condition of flooding in the area near the described location must occur, even if the flood does not reach the building; or

(b) A legally authorized official must issue an evacuation order or other civil order for the community in which the building is located calling for measures to preserve life and property from the peril of flood.

This coverage does not increase the Coverage A or Coverage B Limit of Liability.

b. Property Removed to Safety

(1) We will pay up to $1,000 for the reasonable expenses you incur to move insured property to a place other than the described location that contains the property in order to protect it from flood or the imminent danger of flood.

Reasonable expenses include the value of work, at the Federal minimum wage, you or a member of your household perform.

(2) If you move insured property to a location other than the described location that contains the property, in order to protect it from flood or the imminent danger of flood, we will cover such property while at that location for a period of 45 consecutive days from the date you begin to move it there. The personal property that is moved must be

277

placed in a fully enclosed building or otherwise reasonably protected from the elements.

Any property removed, including a moveable home described in II.6.b.and c., must be placed above ground level or outside of the special flood hazard area.

This coverage does not increase the Coverage A or Coverage B Limit of Liability.

3. *Condominium Loss Assessments.*

a. If this policy insures a unit, we will pay, up to the Coverage A limit of liability, your share of loss assessments charged against you by the condominium association in accordance with the condominium association's articles of association, declarations and your deed.

The assessment must be made as a result of direct physical loss by or from flood during the policy term, to the building's common elements.

b. We will not pay any loss assessment charged against you:

(1) And the condominium association by any governmental body;

(2) That results from a deductible under the insurance purchased by the condominium association insuring common elements;

(3) That results from a loss to personal property, including contents of a condominium building;

(4) That results from a loss sustained by the condominium association that was not reimbursed under a flood insurance policy written in the name of the association under the Act because the building was not, at the time of loss, insured for an amount equal to the lesser of:

(a) 80% or more of its full replacement cost; or

(b) The maximum amount of insurance permitted under the Act;

(5) To the extent that payment under this policy for a condominium building loss, in combination with payments under any other NFIP policies for the same building loss, exceeds the maximum amount permitted under the Act for that kind of building; or

(6) To the extent that payment under this policy for a condominium building loss, in combination with any recovery available to you as a tenant in common under any NFIP condominium association policies for the same building loss, exceeds the amount of insurance permitted under the Act for a single-family dwelling.

Loss assessment coverage does not increase the Coverage A Limit of Liability.

*D. Coverage D—Increased Cost of Compliance*

1. *General.*

This policy pays you to comply with a State or local floodplain management law or ordinance affecting repair or reconstruction of a structure suffering flood damage. Compliance activities eligible for payment are: elevation, floodproofing, relocation, or demolition (or any combination of these activities) of your structure. Eligible floodproofing activities are limited to:

a. Non-residential structures.

b. Residential structures with basements that satisfy FEMA's standards published in the Code of Federal Regulations [44 CFR 60.6 (b) or (c)].

2. *Limit of Liability.*

We will pay you up to $30,000 under this Coverage D—Increased Cost of Compliance, which only applies to policies with building coverage (Coverage A). Our payment of claims under Coverage D is in addition to the amount of coverage which you selected on the application and which appears on the Declarations Page. But the maximum you can collect under this policy for both Coverage A—Building Property and Coverage D—Increased Cost of Compliance cannot exceed the maximum permitted under the Act. We do not charge a separate deductible for a claim under Coverage D.

3. *Eligibility*

a. A structure covered under Coverage A—Building Property sustaining a loss caused by a flood as defined by this policy must:

(1) Be a "repetitive loss structure." A repetitive loss structure is one that meets the following conditions:

(a) The structure is covered by a contract of flood insurance issued under the NFIP.

(b) The structure has suffered flood damage on two occasions during a 10-year period which ends on the date of the second loss.

(c) The cost to repair the flood damage, on average, equaled or exceeded 25% of the market value of the structure at the time of each flood loss.

(d) In addition to the current claim, the NFIP must have paid the previous qualifying claim, and the State or community must have a cumulative, substantial damage provision or repetitive loss provision in its floodplain management law or ordinance being enforced against the structure; or

(2) Be a structure that has had flood damage in which the cost to repair equals or exceeds 50% of the market value of the structure at the time of the flood. The State or community must have a substantial damage provision in its floodplain management law or ordinance being enforced against the structure.

b. This Coverage D pays you to comply with State or local floodplain management laws or ordinances that meet the minimum standards of the National Flood Insurance Program found in the Code of Federal Regulations at 44 CFR 60.3. We pay for compliance activities that exceed those standards under these conditions:

(1) 3.a.(1) above.

(2) Elevation or floodproofing in any risk zone to preliminary or advisory base flood

**Federal Emergency Management Agency, DHS**          **Pt. 61, App. A(1)**

elevations provided by FEMA which the State or local government has adopted and is enforcing for flood-damaged structures in such areas. (This includes compliance activities in B, C, X, or D zones which are being changed to zones with base flood elevations. This also includes compliance activities in zones where base flood elevations are being increased, and a flood-damaged structure must comply with the higher advisory base flood elevation.) Increased Cost of Compliance coverage does not apply to situations in B, C, X, or D zones where the community has derived its own elevations and is enforcing elevation or floodproofing requirements for flood-damaged structures to elevations derived solely by the community.

(3) Elevation or floodproofing above the base flood elevation to meet State or local "freeboard" requirements, *i.e.*, that a structure must be elevated above the base flood elevation.

c. Under the minimum NFIP criteria at 44 CFR 60.3(b)(4), States and communities must require the elevation or floodproofing of structures in unnumbered A zones to the base flood elevation where elevation data is obtained from a Federal, State, or other source. Such compliance activities are also eligible for Coverage D.

d. This coverage will also pay for the incremental cost, after demolition or relocation, of elevating or floodproofing a structure during its rebuilding at the same or another site to meet State or local floodplain management laws or ordinances, subject to Exclusion D.5.g. below.

e. This coverage will also pay to bring a flood-damaged structure into compliance with state or local floodplain management laws or ordinances even if the structure had received a variance before the present loss from the applicable floodplain management requirements.

4. *Conditions.*

a. When a structure covered under Coverage A—Building Property sustains a loss caused by a flood, our payment for the loss under this Coverage D will be for the increased cost to elevate, floodproof, relocate, or demolish (or any combination of these activities) caused by the enforcement of current State or local floodplain management ordinances or laws. Our payment for eligible demolition activities will be for the cost to demolish and clear the site of the building debris or a portion thereof caused by the enforcement of current State or local floodplain management ordinances or laws. Eligible activities for the cost of clearing the site will include those necessary to discontinue utility service to the site and ensure proper abandonment of on-site utilities.

b. When the building is repaired or rebuilt, it must be intended for the same occupancy as the present building unless otherwise re-

quired by current floodplain management ordinances or laws.

5. *Exclusions.*

Under this Coverage D (Increased Cost of Compliance) we will not pay for:

a. The cost to comply with any floodplain management law or ordinance in communities participating in the Emergency Program.

b. The cost associated with enforcement of any ordinance or law that requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of pollutants.

c. The loss in value to any insured building or other structure due to the requirements of any ordinance or law.

d. The loss in residual value of the undamaged portion of a building demolished as a consequence of enforcement of any State or local floodplain management law or ordinance.

e. Any Increased Cost of Compliance under this Coverage D:

(1) Until the building is elevated, floodproofed, demolished, or relocated on the same or to another premises; and

(2) Unless the building is elevated, floodproofed, demolished, or relocated as soon as reasonably possible after the loss, not to exceed two years.

f. Any code upgrade requirements, *e.g.*, plumbing or electrical wiring, not specifically related to the State or local floodplain management law or ordinance.

g. Any compliance activities needed to bring additions or improvements made after the loss occurred into compliance with State or local floodplain management laws or ordinances.

h. Loss due to any ordinance or law that you were required to comply with before the current loss.

i. Any rebuilding activity to standards that do not meet the NFIP's minimum requirements. This includes any situation where the insured has received from the State or community a variance in connection with the current flood loss to rebuild the property to an elevation below the base flood elevation.

j. Increased Cost of Compliance for a garage or carport.

k. Any structure insured under an NFIP Group Flood Insurance Policy.

l. Assessments made by a condominium association on individual condominium unit owners to pay increased costs of repairing commonly owned buildings after a flood in compliance with State or local floodplain management ordinances or laws.

6. *Other Provisions.*

279

a. Increased Cost of Compliance coverage will not be included in the calculation to determine whether coverage meets the 80% insurance-to-value requirement for replacement cost coverage as set forth in VII. General Conditions, V. Loss Settlement.

b. All other conditions and provisions of the policy apply.

### IV. PROPERTY NOT COVERED

We do not cover any of the following:

1. Personal property not inside a building;

2. A building, and personal property in it, located entirely in, on, or over water or seaward of mean high tide if it was constructed or substantially improved after September 30, 1982;

3. Open structures, including a building used as a boathouse or any structure or building into which boats are floated, and personal property located in, on, or over water;

4. Recreational vehicles other than travel trailers described in the Definitions section (see II.B.6.c.) whether affixed to a permanent foundation or on wheels;

5. Self-propelled vehicles or machines, including their parts and equipment. However, we do cover self-propelled vehicles or machines not licensed for use on public roads that are:

a. Used mainly to service the described location or

b. Designed and used to assist handicapped persons, while the vehicles or machines are inside a building at the described location;

6. Land, land values, lawns, trees, shrubs, plants, growing crops, or animals;

7. Accounts, bills, coins, currency, deeds, evidences of debt, medals, money, scrip, stored value cards, postage stamps, securities, bullion, manuscripts, or other valuable papers;

8. Underground structures and equipment, including wells, septic tanks, and septic systems;

9. Those portions of walks, walkways, decks, driveways, patios and other surfaces, all whether protected by a roof or not, located outside the perimeter, exterior walls of the insured building or the building in which the insured unit is located;

10. Containers, including related equipment, such as, but not limited to, tanks containing gases or liquids;

11. Buildings or units and all their contents if more than 49% of the actual cash value of the building is below ground, unless the lowest level is at or above the base flood elevation and is below ground by reason of earth having been used as insulation material in conjunction with energy efficient building techniques;

12. Fences, retaining walls, seawalls, bulkheads, wharves, piers, bridges, and docks;

13. Aircraft or watercraft, or their furnishings and equipment;

14. Hot tubs and spas that are not bathroom fixtures, and swimming pools, and their equipment, such as, but not limited to, heaters, filters, pumps, and pipes, wherever located;

15. Property not eligible for flood insurance pursuant to the provisions of the Coastal Barrier Resources Act and the Coastal Barrier Improvement Act and amendments to these Acts;

16. Personal property you own in common with other unit owners comprising the membership of a condominium association.

### V. EXCLUSIONS

A. We only pay for direct physical loss by or from flood, which means that we do not pay you for:

1. Loss of revenue or profits;

2. Loss of access to the insured property or described location;

3. Loss of use of the insured property or described location;

4. Loss from interruption of business or production;

5. Any additional living expenses incurred while the insured building is being repaired or is unable to be occupied for any reason;

6. The cost of complying with any ordinance or law requiring or regulating the construction, demolition, remodeling, renovation, or repair of property, including removal of any resulting debris. This exclusion does not apply to any eligible activities we describe in Coverage D—Increased Cost of Compliance; or

7. Any other economic loss you suffer.

B. We do not insure a loss directly or indirectly caused by a flood that is already in progress at the time and date:

1. The policy term begins; or

2. Coverage is added at your request.

C. We do not insure for loss to property caused directly by earth movement even if the earth movement is caused by flood. Some examples of earth movement that we do not cover are:

1. Earthquake;

2. Landslide;

3. Land subsidence;

4. Sinkholes;

5. Destabilization or movement of land that results from accumulation of water in subsurface land area; or

6. Gradual erosion.

We do, however, pay for losses from mudflow and land subsidence as a result of erosion that are specifically covered under our definition of flood (see II.A.1.c. and II.A.2.).

D. We do not insure for direct physical loss caused directly or indirectly by any of the following:

1. The pressure or weight of ice;

2. Freezing or thawing;

3. Rain, snow, sleet, hail, or water spray;

**Federal Emergency Management Agency, DHS**　　　**Pt. 61, App. A(1)**

4. Water, moisture, mildew, or mold damage that results primarily from any condition:

a. Substantially confined to the dwelling; or

b. That is within your control, including but not limited to:

(1) Design, structural, or mechanical defects;

(2) Failure, stoppage, or breakage of water or sewer lines, drains, pumps, fixtures, or equipment; or

(3) Failure to inspect and maintain the property after a flood recedes;

5. Water or water-borne material that:

a. Backs up through sewers or drains;

b. Discharges or overflows from a sump, sump pump or related equipment; or

c. Seeps or leaks on or through the covered property;

unless there is a flood in the area and the flood is the proximate cause of the sewer or drain backup, sump pump discharge or overflow, or the seepage of water;

6. The pressure or weight of water unless there is a flood in the area and the flood is the proximate cause of the damage from the pressure or weight of water;

7. Power, heating, or cooling failure unless the failure results from direct physical loss by or from flood to power, heating, or cooling equipment on the described location;

8. Theft, fire, explosion, wind, or windstorm;

9. Anything you or any member of your household do or conspires to do to deliberately cause loss by flood; or

10. Alteration of the insured property that significantly increases the risk of flooding.

E. We do not insure for loss to any building or personal property located on land leased from the Federal Government, arising from or incident to the flooding of the land by the Federal Government, where the lease expressly holds the Federal Government harmless under flood insurance issued under any Federal Government program.

F. We do not pay for the testing for or monitoring of pollutants unless required by law or ordinance.

## VI. DEDUCTIBLES

A. When a loss is covered under this policy, we will pay only that part of the loss that exceeds your deductible amount, subject to the limit of liability that applies. The deductible amount is shown on the Declarations Page.

However, when a building under construction, alteration, or repair does not have at least two rigid exterior walls and a fully secured roof at the time of loss, your deductible amount will be two times the deductible that would otherwise apply to a completed building.

B. In each loss from flood, separate deductibles apply to the building and personal property insured by this policy.

C. The deductible does NOT apply to:

1. III.C.2. Loss Avoidance Measures;

2. III.C.3. Condominium Loss Assessments; or

3. III.D. Increased Cost of Compliance.

### VII. GENERAL CONDITIONS

#### A. Pair and Set Clause

In case of loss to an article that is part of a pair or set, we will have the option of paying you:

1. An amount equal to the cost of replacing the lost, damaged, or destroyed article, minus its depreciation, or

2. The amount that represents the fair proportion of the total value of the pair or set that the lost, damaged, or destroyed article bears to the pair or set.

#### B. Concealment or Fraud and Policy Voidance

1. With respect to all insureds under this policy, this policy:

a. Is void;

b. Has no legal force or effect;

c. Cannot be renewed; and

d. Cannot be replaced by a new NFIP policy, if, before or after a loss, you or any other insured or your agent have at any time:

(1) Intentionally concealed or misrepresented any material fact or circumstance;

(2) Engaged in fraudulent conduct; or

(3) Made false statements; relating to this policy or any other NFIP insurance.

2. This policy will be void as of the date wrongful acts described in B.1.above were committed.

3. Fines, civil penalties, and imprisonment under applicable Federal laws may also apply to the acts of fraud or concealment described above.

4. This policy is also void for reasons other than fraud, misrepresentation, or wrongful act. This policy is void from its inception and has no legal force under the following conditions:

a. If the property is located in a community that was not participating in the NFIP on the policy's inception date and did not join or reenter the program during the policy term and before the loss occurred; or

b. If the property listed on the application is otherwise not eligible for coverage under the NFIP.

#### C. Other Insurance

1. If a loss covered by this policy is also covered by other insurance that includes flood coverage not issued under the Act, we will not pay more than the amount of insurance you are entitled to for lost, damaged, or

destroyed property insured under this policy subject to the following:

a. We will pay only the proportion of the loss that the amount of insurance that applies under this policy bears to the total amount of insurance covering the loss, unless C.1.b. or c. immediately below applies.

b. If the other policy has a provision stating that it is excess insurance, this policy will be primary.

c. This policy will be primary (but subject to its own deductible) up to the deductible in the other flood policy (except another policy as described in C.1.b. above). When the other deductible amount is reached, this policy will participate in the same proportion that the amount of insurance under this policy bears to the total amount of both policies, for the remainder of the loss.

2. If there is other insurance in the name of your condominium association covering the same property covered by this policy, then this policy will be in excess over the other insurance.

### D. Amendments, Waivers, Assignment

This policy cannot be changed nor can any of its provisions be waived without the express written consent of the Federal Insurance Administrator. No action we take under the terms of this policy constitutes a waiver of any of our rights. You may assign this policy in writing when you transfer title of your property to someone else except under these conditions:

1. When this policy covers only personal property; or

2. When this policy covers a structure during the course of construction.

### E. Cancellation of the Policy by You

1. You may cancel this policy in accordance with the applicable rules and regulations of the NFIP.

2. If you cancel this policy, you may be entitled to a full or partial refund of premium also under the applicable rules and regulations of the NFIP.

### F. Non-Renewal of the Policy by Us

Your policy will not be renewed:

1. If the community where your covered property is located stops participating in the NFIP, or

2. If your building has been declared ineligible under section 1316 of the Act.

### G. Reduction and Reformation of Coverage

1. If the premium we received from you was not enough to buy the kind and amount of coverage you requested, we will provide only the amount of coverage that can be purchased for the premium payment we received.

2. The policy can be reformed to increase the amount of coverage resulting from the reduction described in G.1. above to the amount you requested as follows:

a. Discovery of Insufficient Premium or Incomplete Rating Information Before a Loss:

(1) If we discover before you have a flood loss that your premium payment was not enough to buy the requested amount of coverage, we will send you and any mortgagee or trustee known to us a bill for the required additional premium for the current policy term (or that portion of the current policy term following any endorsement changing the amount of coverage). If you or the mortgagee or trustee pay the additional premium within 30 days from the date of our bill, we will reform the policy to increase the amount of coverage to the originally requested amount effective to the beginning of the current policy term (or subsequent date of any endorsement changing the amount of coverage).

(2) If we determine before you have a flood loss that the rating information we have is incomplete and prevents us from calculating the additional premium, we will ask you to send the required information. You must submit the information within 60 days of our request. Once we determine the amount of additional premium for the current policy term, we will follow the procedure in G.2.a.(1) above.

(3) If we do not receive the additional premium (or additional information) by the date it is due, the amount of coverage can only be increased by endorsement subject to any appropriate waiting period.

b. Discovery of Insufficient Premium or Incomplete Rating Information After a Loss:

(1) If we discover after you have a flood loss that your premium payment was not enough to buy the requested amount of coverage, we will send you and any mortgagee or trustee known to us a bill for the required additional premium for the current and the prior policy terms. If you or the mortgagee or trustee pay the additional premium within 30 days of the date of our bill, we will reform the policy to increase the amount of coverage to the originally requested amount effective to the beginning of the prior policy term.

(2) If we discover after you have a flood loss that the rating information we have is incomplete and prevents us from calculating the additional premium, we will ask you to send the required information. You must submit the information before your claim can be paid. Once we determine the amount of additional premium for the current and prior policy terms, we will follow the procedure in G.2.b.(1) above.

(3) If we do not receive the additional premium by the date it is due, your flood insurance claim will be settled based on the reduced amount of coverage. The amount of

**Federal Emergency Management Agency, DHS**         **Pt. 61, App. A(1)**

coverage can only be increased by endorsement subject to any appropriate waiting period.

3. However, if we find that you or your agent intentionally did not tell us, or falsified, any important fact or circumstance or did anything fraudulent relating to this insurance, the provisions of Condition B. Concealment or Fraud and Policy Voidance apply.

### H. Policy Renewal

1. This policy will expire at 12:01 a.m. on the last day of the policy term.

2. We must receive the payment of the appropriate renewal premium within 30 days of the expiration date.

3. If we find, however, that we did not place your renewal notice into the U.S. Postal Service, or if we did mail it, we made a mistake, e.g., we used an incorrect, incomplete, or illegible address, which delayed its delivery to you before the due date for the renewal premium, then we will follow these procedures:

a. If you or your agent notified us, not later than one year after the date on which the payment of the renewal premium was due, of non-receipt of a renewal notice before the due date for the renewal premium, and we determine that the circumstances in the preceding paragraph apply, we will mail a second bill providing a revised due date, which will be 30 days after the date on which the bill is mailed.

b. If we do not receive the premium requested in the second bill by the revised due date, then we will not renew the policy. In that case, the policy will remain an expired policy as of the expiration date shown on the Declarations Page.

4. In connection with the renewal of this policy, we may ask you during the policy term to recertify, on a Recertification Questionnaire we will provide to you, the rating information used to rate your most recent application for or renewal of insurance.

### I. Conditions Suspending or Restricting Insurance

We are not liable for loss that occurs while there is a hazard that is increased by any means within your control or knowledge.

### J. Requirements in Case of Loss

In case of a flood loss to insured property, you must:

1. Give prompt written notice to us;

2. As soon as reasonably possible, separate the damaged and undamaged property, putting it in the best possible order so that we may examine it;

3. Prepare an inventory of damaged property showing the quantity, description, actual cash value, and amount of loss. Attach all bills, receipts, and related documents;

4. Within 60 days after the loss, send us a proof of loss, which is your statement of the amount you are claiming under the policy signed and sworn to by you, and which furnishes us with the following information:

a. The date and time of loss;

b. A brief explanation of how the loss happened;

c. Your interest (for example, "owner") and the interest, if any, of others in the damaged property;

d. Details of any other insurance that may cover the loss;

e. Changes in title or occupancy of the covered property during the term of the policy;

f. Specifications of damaged buildings and detailed repair estimates;

g. Names of mortgagees or anyone else having a lien, charge, or claim against the insured property;

h. Details about who occupied any insured building at the time of loss and for what purpose; and

i. The inventory of damaged personal property described in J.3. above.

5. In completing the proof of loss, you must use your own judgment concerning the amount of loss and justify that amount.

6. You must cooperate with the adjuster or representative in the investigation of the claim.

7. The insurance adjuster whom we hire to investigate your claim may furnish you with a proof of loss form, and she or he may help you complete it. However, this is a matter of courtesy only, and you must still send us a proof of loss within 60 days after the loss even if the adjuster does not furnish the form or help you complete it.

8. We have not authorized the adjuster to approve or disapprove claims or to tell you whether we will approve your claim.

9. At our option, we may accept the adjuster's report of the loss instead of your proof of loss. The adjuster's report will include information about your loss and the damages you sustained. You must sign the adjuster's report. At our option, we may require you to swear to the report.

### K. Our Options After a Loss

Options we may, in our sole discretion, exercise after loss include the following:

1. At such reasonable times and places that we may designate, you must:

a. Show us or our representative the damaged property;

b. Submit to examination under oath, while not in the presence of another insured, and sign the same; and

c. Permit us to examine and make extracts and copies of:

(1) Any policies of property insurance insuring you against loss and the deed establishing your ownership of the insured real property;

283

(2) Condominium association documents including the Declarations of the condominium, its Articles of Association or Incorporation, Bylaws, rules and regulations, and other relevant documents if you are a unit owner in a condominium building; and

(3) All books of accounts, bills, invoices and other vouchers, or certified copies pertaining to the damaged property if the originals are lost.

2. We may request, in writing, that you furnish us with a complete inventory of the lost, damaged or destroyed property, including:

a. Quantities and costs;

b. Actual cash values or replacement cost (whichever is appropriate);

c. Amounts of loss claimed;

d. Any written plans and specifications for repair of the damaged property that you can reasonably make available to us; and

e. Evidence that prior flood damage has been repaired.

3. If we give you written notice within 30 days after we receive your signed, sworn proof of loss, we may:

a. Repair, rebuild, or replace any part of the lost, damaged, or destroyed property with material or property of like kind and quality or its functional equivalent; and

b. Take all or any part of the damaged property at the value that we agree upon or its appraised value.

### L. No Benefit to Bailee

No person or organization, other than you, having custody of covered property will benefit from this insurance.

### M. Loss Payment

1. We will adjust all losses with you. We will pay you unless some other person or entity is named in the policy or is legally entitled to receive payment. Loss will be payable 60 days after we receive your proof of loss (or within 90 days after the insurance adjuster files the adjuster's report signed and sworn to by you in lieu of a proof of loss) and:

a. We reach an agreement with you;

b. There is an entry of a final judgment; or

c. There is a filing of an appraisal award with us, as provided in VII. P.

2. If you reject our proof of loss in whole or in part you may:

a. Accept our denial of your claim;

b. Exercise your rights under this policy; or

c. File an amended proof of loss as long as it is filed within 60 days of the date of the loss.

### N. Abandonment

You may not abandon to us damaged or undamaged property insured under this policy.

### O. Salvage

We may permit you to keep damaged property insured under this policy after a loss, and we will reduce the amount of the loss proceeds payable to you under the policy by the value of the salvage.

### P. Appraisal

If you and we fail to agree on the actual cash value or, if applicable, replacement cost of your damaged property to settle upon the amount of loss, then either may demand an appraisal of the loss. In this event, you and we will each choose a competent and impartial appraiser within 20 days after receiving a written request from the other. The two appraisers will choose an umpire. If they cannot agree upon an umpire within 15 days, you or we may request that the choice be made by a judge of a court of record in the state where the covered property is located. The appraisers will separately state the actual cash value, the replacement cost, and the amount of loss to each item. If the appraisers submit a written report of an agreement to us, the amount agreed upon will be the amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will set the amount of actual cash value and loss, or if it applies, the replacement cost and loss.

Each party will:

1. Pay its own appraiser; and

2. Bear the other expenses of the appraisal and umpire equally.

### Q. Mortgage Clause

The word "mortgagee" includes trustee.

Any loss payable under Coverage A—Building Property will be paid to any mortgagee of whom we have actual notice, as well as any other mortgagee or loss payee determined to exist at the time of loss, and you, as interests appear. If more than one mortgagee is named, the order of payment will be the same as the order of precedence of the mortgages.

If we deny your claim, that denial will not apply to a valid claim of the mortgagee, if the mortgagee:

1. Notifies us of any change in the ownership or occupancy, or substantial change in risk of which the mortgagee is aware;

2. Pays any premium due under this policy on demand if you have neglected to pay the premium; and

3. Submits a signed, sworn proof of loss within 60 days after receiving notice from us of your failure to do so.

All of the terms of this policy apply to the mortgagee.

The mortgagee has the right to receive loss payment even if the mortgagee has started foreclosure or similar action on the building.

If we decide to cancel or not renew this policy, it will continue in effect for the benefit of the mortgagee only for 30 days after we notify the mortgagee of the cancellation or non-renewal.

If we pay the mortgagee for any loss and deny payment to you, we are subrogated to all the rights of the mortgagee granted under the mortgage on the property. Subrogation will not impair the right of the mortgagee to recover the full amount of the mortgagee's claim.

### R. Suit Against Us

You may not sue us to recover money under this policy unless you have complied with all the requirements of the policy. If you do sue, you must start the suit within one year after the date of the written denial of all or part of the claim, and you must file the suit in the United States District Court of the district in which the covered property was located at the time of loss. This requirement applies to any claim that you may have under this policy and to any dispute that you may have arising out of the handling of any claim under the policy.

### S. Subrogation

Whenever we make a payment for a loss under this policy, we are subrogated to your right to recover for that loss from any other person. That means that your right to recover for a loss that was partly or totally caused by someone else is automatically transferred to us, to the extent that we have paid you for the loss. We may require you to acknowledge this transfer in writing. After the loss, you may not give up our right to recover this money or do anything that would prevent us from recovering it. If you make any claim against any person who caused your loss and recover any money, you must pay us back first before you may keep any of that money.

### T. Continuous Lake Flooding

1. If an insured building has been flooded by rising lake waters continuously for 90 days or more and it appears reasonably certain that a continuation of this flooding will result in a covered loss to the insured building equal to or greater than the building policy limits plus the deductible or the maximum payable under the policy for any one building loss, we will pay you the lesser of these two amounts without waiting for the further damage to occur if you sign a release agreeing:

a. To make no further claim under this policy;

b. Not to seek renewal of this policy;

c. Not to apply for any flood insurance under the Act for property at the described location; and

d. Not to seek a premium refund for current or prior terms.

If the policy term ends before the insured building has been flooded continuously for 90 days, the provisions of this paragraph T.1. will apply when the insured building suffers a covered loss before the policy term ends.

2. If your insured building is subject to continuous lake flooding from a closed basin lake, you may elect to file a claim under either paragraph T.1. above or T.2. (A "closed basin lake" is a natural lake from which water leaves primarily through evaporation and whose surface area now exceeds or has exceeded one square mile at any time in the recorded past. Most of the nation's closed basin lakes are in the western half of the United States where annual evaporation exceeds annual precipitation and where lake levels and surface areas are subject to considerable fluctuation due to wide variations in the climate. These lakes may overtop their basins on rare occasions.) Under this paragraph T.2., we will pay your claim as if the building is a total loss even though it has not been continuously inundated for 90 days, subject to the following conditions:

a. Lake flood waters must damage or imminently threaten to damage your building.

b. Before approval of your claim, you must:

(1) Agree to a claim payment that reflects your buying back the salvage on a negotiated basis; and

(2) Grant the conservation easement described in FEMA's "Policy Guidance for Closed Basin Lakes" to be recorded in the office of the local recorder of deeds. FEMA, in consultation with the community in which the property is located, will identify on a map an area or areas of special consideration (ASC) in which there is a potential for flood damage from continuous lake flooding. FEMA will give the community the agreed-upon map showing the ASC. This easement will only apply to that portion of the property in the ASC. It will allow certain agricultural and recreational uses of the land. The only structures it will allow on any portion of the property within the ASC are certain simple agricultural and recreational structures. If any of these allowable structures are insurable buildings under the NFIP and are insured under the NFIP, they will not be eligible for the benefits of this paragraph T.2. If a U.S. Army Corps of Engineers certified flood control project or otherwise certified flood control project later protects the property, FEMA will, upon request, amend the ASC to remove areas protected by those projects. The restrictions of the easement will then no longer apply to any portion of the property removed from the ASC; and

(3) Comply with paragraphs T.1.a. through T.1.d. above.

c. Within 90 days of approval of your claim, you must move your building to a new location outside the ASC. FEMA will give you an additional 30 days to move if you show there is sufficient reason to extend the time.

d. Before the final payment of your claim, you must acquire an elevation certificate and a floodplain development permit from the local floodplain administrator for the new location of your building.

e. Before the approval of your claim, the community having jurisdiction over your building must:

(1) Adopt a permanent land use ordinance, or a temporary moratorium for a period not to exceed 6 months to be followed immediately by a permanent land use ordinance, that is consistent with the provisions specified in the easement required in paragraph T.2.b. above.

(2) Agree to declare and report any violations of this ordinance to FEMA so that under Section 1316 of the National Flood Insurance Act of 1968, as amended, flood insurance to the building can be denied; and

(3) Agree to maintain as deed-restricted, for purposes compatible with open space or agricultural or recreational use only, any affected property the community acquires an interest in. These deed restrictions must be consistent with the provisions of paragraph T.2.b. above, except that, even if a certified project protects the property, the land use restrictions continue to apply if the property was acquired under the Hazard Mitigation Grant Program or the Flood Mitigation Assistance Program. If a non-profit land trust organization receives the property as a donation, that organization must maintain the property as deed-restricted, consistent with the provisions of paragraph T.2.b. above.

f. Before the approval of your claim, the affected State must take all action set forth in FEMA's "Policy Guidance for Closed Basin Lakes."

g. You must have NFIP flood insurance coverage continuously in effect from a date established by FEMA until you file a claim under paragraph T.2. If a subsequent owner buys NFIP insurance that goes into effect within 60 days of the date of transfer of title, any gap in coverage during that 60-day period will not be a violation of this continuous coverage requirement. For the purpose of honoring a claim under this paragraph T.2, we will not consider to be in effect any increased coverage that became effective after the date established by FEMA. The exception to this is any increased coverage in the amount suggested by your insurer as an inflation adjustment.

h. This paragraph T.2. will be in effect for a community when the FEMA Regional Director for the affected region provides to the community, in writing, the following:

(1) Confirmation that the community and the State are in compliance with the conditions in paragraphs T.2.e. and T.2.f. above, and

(2) The date by which you must have flood insurance in effect.

*U. Duplicate Policies Not Allowed*

1. We will not insure your property under more than one NFIP policy.

If we find that the duplication was not knowingly created, we will give you written notice. The notice will advise you that you may choose one of several options under the following procedures:

a. If you choose to keep in effect the policy with the earlier effective date, you may also choose to add the coverage limits of the later policy to the limits of the earlier policy. The change will become effective as of the effective date of the later policy.

b. If you choose to keep in effect the policy with the later effective date, you may also choose to add the coverage limits of the earlier policy to the limits of the later policy. The change will be effective as of the effective date of the later policy.

In either case, you must pay the pro rata premium for the increased coverage limits within 30 days of the written notice. In no event will the resulting coverage limits exceed the permissible limits of coverage under the Act or your insurable interest, whichever is less. We will make a refund to you, according to applicable NFIP rules, of the premium for the policy not being kept in effect.

2. Your option under Condition U. Duplicate Policies Not Allowed to elect which NFIP policy to keep in effect does not apply when duplicates have been knowingly created. Losses occurring under such circumstances will be adjusted according to the terms and conditions of the earlier policy. The policy with the later effective date must be canceled.

*V. Loss Settlement*

1. Introduction

This policy provides three methods of settling losses: Replacement Cost, Special Loss Settlement, and Actual Cash Value. Each method is used for a different type of property, as explained in a–c. below.

a. Replacement Cost Loss Settlement, described in V.2. below, applies to a single-family dwelling provided:

(1) It is your principal residence, which means that, at the time of loss, you or your spouse lived there for 80% of:

(a) The 365 days immediately preceding the loss; or

(b) The period of your ownership, if you owned the dwelling for less than 365 days; and

(2) At the time of loss, the amount of insurance in this policy that applies to the dwelling is 80% or more of its full replacement cost immediately before the loss, or is

the maximum amount of insurance available under the NFIP.

b. Special Loss Settlement, described in V.3. below, applies to a single-family dwelling that is a manufactured or mobile home or a travel trailer.

c. Actual Cash Value loss settlement applies to a single-family dwelling not subject to replacement cost or special loss settlement, and to the property listed in V.4. below.

### 2. Replacement Cost Loss Settlement

The following loss settlement conditions apply to a single-family dwelling described in V.I.a. above:

a. We will pay to repair or replace the damaged dwelling after application of the deductible and without deduction for depreciation, but not more than the least of the following amounts:

(1) The building limit of liability shown on your Declarations Page;

(2) The replacement cost of that part of the dwelling damaged, with materials of like kind and quality and for like use; or

(3) The necessary amount actually spent to repair or replace the damaged part of the dwelling for like use.

b. If the dwelling is rebuilt at a new location, the cost described above is limited to the cost that would have been incurred if the dwelling had been rebuilt at its former location.

c. When the full cost of repair or replacement is more than $1,000, or more than 5% of the whole amount of insurance that applies to the dwelling, we will not be liable for any loss under V.2.a. above or V.4.a.(2) below unless and until actual repair or replacement is completed.

d. You may disregard the replacement cost conditions above and make claim under this policy for loss to dwellings on an actual cash value basis. You may then make claim for any additional liability according to V.2.a., b., and c. above, provided you notify us of your intent to do so within 180 days after the date of loss.

e. If the community in which your dwelling is located has been converted from the Emergency Program to the Regular Program during the current policy term, then we will consider the maximum amount of available NFIP insurance to be the amount that was available at the beginning of the current policy term.

### 3. Special Loss Settlement

a. The following loss settlement conditions apply to a single-family dwelling that:

(1) is a manufactured or mobile home or a travel trailer, as defined in II.B.6.b. and c.,

(2) is at least 16 feet wide when fully assembled and has an area of at least 600 square feet within its perimeter walls when fully assembled, and

(3) is your principal residence as specified in V.I.a.(1) above.

b. If such a dwelling is totally destroyed or damaged to such an extent that, in our judgment, it is not economically feasible to repair, at least to its pre-damage condition, we will, at our discretion pay the least of the following amounts:

(1) The lesser of the replacement cost of the dwelling or 1.5 times the actual cash value, or

(2) The building limit of liability shown on your Declarations Page.

c. If such a dwelling is partially damaged and, in our judgment, it is economically feasible to repair it to its pre-damage condition, we will settle the loss according to the Replacement Cost conditions in V.2.above.

### 4. Actual Cash Value Loss Settlement

The types of property noted below are subject to actual cash value (or in the case of V.4.a.(2), below, proportional) loss settlement.

a. A dwelling, at the time of loss, when the amount of insurance on the dwelling is both less than 80% of its full replacement cost immediately before the loss and less than the maximum amount of insurance available under the NFIP. In that case, we will pay the greater of the following amounts, but not more than the amount of insurance that applies to that dwelling:

(1) The actual cash value, as defined in II.B.2., of the damaged part of the dwelling; or

(2) A proportion of the cost to repair or replace the damaged part of the dwelling, without deduction for physical depreciation and after application of the deductible.

This proportion is determined as follows: If 80% of the full replacement cost of the dwelling is less than the maximum amount of insurance available under the NFIP, then the proportion is determined by dividing the actual amount of insurance on the dwelling by the amount of insurance that represents 80% of its full replacement cost. But if 80% of the full replacement cost of the dwelling is greater than the maximum amount of insurance available under the NFIP, then the proportion is determined by dividing the actual amount of insurance on the dwelling by the maximum amount of insurance available under the NFIP.

b. A two-, three-, or four-family dwelling.

c. A unit that is not used exclusively for single-family dwelling purposes.

d. Detached garages.

e. Personal property.

f. Appliances, carpets, and carpet pads.

g. Outdoor awnings, outdoor antennas or aerials of any type, and other outdoor equipment.

h. Any property covered under this policy that is abandoned after a loss and remains as debris anywhere on the described location.

i. A dwelling that is not your principal residence.

### 5. Amount of Insurance Required

To determine the amount of insurance required for a dwelling immediately before the loss, we do not include the value of:

a. Footings, foundations, piers, or any other structures or devices that are below the undersurface of the lowest basement floor and support all or part of the dwelling;

b. Those supports listed in V.5.a. above, that are below the surface of the ground inside the foundation walls if there is no basement; and

c. Excavations and underground flues, pipes, wiring, and drains.

NOTE: The Coverage D—Increased Cost of Compliance limit of liability is not included in the determination of the amount of insurance required.

### VIII. LIBERALIZATION CLAUSE

If we make a change that broadens your coverage under this edition of our policy, but does not require any additional premium, then that change will automatically apply to your insurance as of the date we implement the change, provided that this implementation date falls within 60 days before or during the policy term stated on the Declarations Page.

### IX. WHAT LAW GOVERNS

This policy and all disputes arising from the handling of any claim under the policy are governed exclusively by the flood insurance regulations issued by FEMA, the National Flood Insurance Act of 1968, as amended (42 U.S.C. 4001, *et seq.*), and Federal common law.

*In Witness Whereof,* we have signed this policy below and hereby enter into this Insurance Agreement.

JO ANN HOWARD,
*Administrator, Federal Insurance Administration.*

[65 FR 60769, Oct. 12, 2000, as amended at 68 FR 9897, Mar. 3, 2003]

### APPENDIX A(2) TO PART 61

FEDERAL EMERGENCY MANAGEMENT AGENCY, FEDERAL INSURANCE ADMINISTRATION

STANDARD FLOOD INSURANCE POLICY

GENERAL PROPERTY FORM

Please read the policy carefully. The flood insurance coverage provided is subject to limitations, restrictions, and exclusions. This policy provides no coverage:

1. In a regular program community, for a residential condominium building, as defined in this policy; and

2. Except for personal property coverage, for a unit in a condominium building.

### I. AGREEMENT

The Federal Emergency Management Agency (FEMA) provides flood insurance under the terms of the National Flood Insurance Act of 1968 and its Amendments, and Title 44 of the Code of Federal Regulations.

We will pay you for direct physical loss by or from flood to your insured property if you:

1. Have paid the correct premium;

2. Comply with all terms and conditions of this policy; and

3. Have furnished accurate information and statements.

We have the right to review the information you give us at any time and to revise your policy based on our review.

### II. DEFINITIONS

A. In this policy, "you" and "your" refer to the insured(s) shown on the Declarations Page of this policy. Insured(s) includes: Any mortgagee and loss payee named in the Application and Declarations page, as well as any other mortgagee or loss payee determined to exist at the time of loss in the order of precedence. "We," "us," and "our" refer to the insurer.

Some definitions are complex because they are provided as they appear in the law or regulations, or result from court cases. The precise definitions are intended to protect you.

*Flood,* as used in this flood insurance policy, means:

1. A general and temporary condition of partial or complete inundation of two or more acres of normally dry land area or of two or more properties (one of which is your property) from:

a. Overflow of inland or tidal waters;

b. Unusual and rapid accumulation or runoff of surface waters from any source;

c. Mudflow.

2. The collapse or subsidence of land along the shore of a lake or similar body of water as a result of erosion or undermining caused by waves or currents of water exceeding anticipated cyclical levels which result in a flood as defined in A.1.a. above.

B. The following are the other key definitions we use in this policy:

1. *Act.* The National Flood Insurance Act of 1968 and any amendments to it.

2. *Actual Cash Value.* The cost to replace an insured item of property at the time of loss, less the value of its physical depreciation.

3. *Application.* The statement made and signed by you or your agent in applying for

EXHIBIT 2

Westlaw.

Slip Copy

Slip Copy, 2007 WL 2693087 (C.A.5 (Tex.))

**(Cite as: Slip Copy)**

**H**

Wright v. Allstate Ins. Co.

C.A.5 (Tex.),2007.

Only the Westlaw citation is currently available.This case was not selected for publication in the Federal Reporter.Not for Publication in West's Federal Reporter See Fed. Rule of Appellate Procedure 32.1 generally governing citation of judicial decisions issued on or after Jan. 1, 2007.   See also Fifth Circuit Rules 28.7, 47.5.3, 47.5.4.  (Find CTA5 Rule 28 and Find CTA5 Rule 47)

United States Court of Appeals,Fifth Circuit.

Dr. Thomas WRIGHT, Plaintiff-Appellant

v.

ALLSTATE INSURANCE COMPANY, Defendant-Appellee.

**No. 06-20069.**

Sept. 11, 2007.

Dax Faubus, Faubus & Taft, Houston, TX, for Plaintiff-Appellant.

Doug Kevin Clemons, Eggleston & Briscoe, Houston, TX, Gerald Joseph Nielsen, William Truman Treas, Nielsen Law Firm, Metairie, LA, for Defendant-Appellee.

Appeal from the United States District Court for the Southern District of Texas.

Before HIGGINBOTHAM, WIENER, and GARZA, Circuit Judges.

WIENER, Circuit Judge:

**\*1** Plaintiff-Appellant Thomas Wright appeals the district court's refusal to grant him leave to amend his complaint to include extra-contractual claims against Allstate Insurance Company ("Allstate"), the Write Your Own ("WYO") insurance company that issued his federal flood insurance policy. We affirm.

I. FACTS & PROCEEDINGS

As the facts of this case are fully set forth in *Wright v. Allstate*[FN1] ("*Wright I*"), we summarize them only briefly here. Wright purchased a Standard Flood Insurance Policy ("SFIP") from Allstate to cover his Houston home. Under the terms of the National Flood Insurance Act ("NFIA"), Allstate, as a WYO insurer, was authorized to issue flood insurance policies in its own name. The terms and conditions that must be included in such policies are set by the Federal Emergency Management Agency ("FEMA"). All WYO insurers, such as Allstate, act as the fiscal agent of the United States.

FN1.415 F.3d 384 (5th Cir.2005).

In 2001, Wright's home sustained damages from Tropical Storm Allison. When he was unable to reach an agreement with Allstate as to the amount of damages caused by the storm, Wright refused to sign the proof of loss proffered by Allstate's adjuster. Instead, Wright submitted his own proof of loss, writing "to be determined" in the spaces for cost of repairs, depreciation, cash value, and net amount claimed. Allstate responded by letter, stating that "we are accepting this proof in compliance with the policy conditions concerning the filing of a Proof of Loss."Allstate's letter continued, "we expressly reserve all of our rights and defenses in connection with the ascertainment as to the value and loss, if any, and we do not in any way in acknowledging receipt of this Proof of Loss waive any of the rights and defenses [that we possess]." Allstate later rejected Wright's claim be-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                                              Page 2
Slip Copy, 2007 WL 2693087 (C.A.5 (Tex.))
**(Cite as: Slip Copy)**

cause, according to Allstate, Wright failed "(1) to cooperate as required by the terms of the policy and (2) to file an adequate POL within the FEMA-prescribed time frame."

Wright filed suit against Allstate and one of its employees, Guy Chapman, asserting, *inter alia,* breach of contract and *state law* claims for fraud and negligent misrepresentation. Wright later sought leave to amend his complaint to include *federal common law* causes of action for fraud and negligent misrepresentation. The district court dismissed all but Wright's breach of contract claim, holding that the state law claims were preempted by federal law. The district court also denied Wright's request to amend his complaint to include federal common law causes of action for fraud and negligent misrepresentation. Although it held Allstate equitably estopped from asserting Wright's alleged failure to file an adequate proof of loss as a basis for denial of Wright's claim, the district court determined that Wright had failed to prove that all of his claimed damages were caused by flooding and awarded Wright $24,029, plus costs and attorney's fees. Both parties appealed.

**\*2** In *Wright I,* we held that Wright's state law claims were preempted by the NFIA; however, we remanded the case to the district court to clarify the basis of its denial of Wright's motion to amend his complaint. On remand, Wright's motion was again rejected because the court was "not aware by the pleading or otherwise of any federal common law cause(s) of action that might be asserted by [Wright]." The district court went on to characterize Wright's proposed claims as merely "state law causes of action that are preempted by the federal insurance program."

Unsatisfied with the district court's explanation on remand, Wright again appeals the court's order denying his motion to amend his complaint to include federal common law causes of action for fraud and negligent misrepresentation. According to Wright, the NFIA *expressly* provides for such claims, because the SFIP specifies that disputes arising from the handling of an insurance claim shall be governed by federal common law. Wright advances the alternative theory that the NFIA *implicitly* authorizes federal common law claims for fraud and negligent misrepresentation. We reject both of these contentions. As counsel conceded at oral argument that these are extra-contractual claims, Wright is asking us to create private causes of action that are neither expressly nor implicitly authorized by Congress. We decline this invitation to create a private right of action when Congress has not manifested its intent that one should exist.

## II. ANALYSIS

### A. Standard of Review

We review *de novo* whether the NFIA either expressly or implicitly authorizes a private federal common law cause of action for fraud or negligent misrepresentation.[FN2]

> FN2.*Acara v. Banks,* 470 F.3d 569, 570 (5th Cir.2006).

### B. Merits

We begin by addressing Wright's first assertion, that his extra-contractual claims for fraud and negligent misrepresentation are *expressly* authorized by the language of the SFIP. Concluding that they are not, we follow by addressing whether such claims are *implicitly* authorized.

### 1. Express Authorization

Wright contends that the district court erred in refusing to allow him to add federal common law claims to his complaint, insisting that the NFIA, through its prescribed terms for the SFIP, expressly allows for extra-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                                          Page 3
Slip Copy, 2007 WL 2693087 (C.A.5 (Tex.))
**(Cite as: Slip Copy)**

contractual claims in disputes arising under a flood insurance policy. We disagree.

"[W]hether a statute creates a cause of action, either expressly or by implication, is basically a matter of statutory instruction."[FN3] To determine if the NFIA contains express Congressional authorization for a policyholder to bring extra-contractual claims against a WYO insurer, we look to the language of the statute itself. The National Flood Insurance Program ("NFIP") was created by the NFIA and is administered by FEMA.[FN4] Through its regulations, FEMA establishes the terms and conditions of the SFIP, the rate structures, and the premium costs for the program.[FN5] Article IX of the SFIP dictates the controlling law:

> FN3. *Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 15 (1979).

> FN4. 42 U.S.C. §§ 4001, 4011(a).

> FN5. *Gallup v. Omaha Property & Cas. Ins. Co.,* 434 F.3d 341, 342 (5th Cir.2005).

**\*3 IX. What Law Governs**
This policy and all disputes arising form the handling of any claim under the policy are governed exclusively by the flood insurance regulations issued by FEMA, and National Flood Insurance Act of 1968, as amended (42 U.S.C. 4001, et seq.), and Federal common law.[FN6]

> FN6. 44 C.F.R. Pt. 61, App. A(1), article IX.

Even though the NFIA does allow a policyholder to sue a WYO insurer for amounts due under the contract, nowhere in the NFIA or the SFIP does Congress explicitly reference any right of a policyholder to bring extra-contractual claims against a WYO insurer.[FN7]

> FN7. 42 U.S.C. §§ 4053, 4072.

Wright insists that, because the SFIP states that disputes arising from the handling of a claim under the policy are governed, in part, by federal common law, Congress intended for courts to allow policyholders to bring extra-contractual claims against an insurer. Aside from the SFIP language itself, Wright provides no evidence to support this conclusion. We previously recognized that the reference to federal common law in the SFIP directs courts to employ standard insurance principles when deciding *coverage* issues under the policy.[FN8] It does not confer on policyholders the right to assert extra-contractual claims against WYO insurers-which claims, if successful, would likely be paid with government funds.[FN9]

> FN8. *See Hanover Bldg. Materials Inc. v. Guiffrida,* 748 F.2d 1011, 1013 (5th Cir.1984) (*quoting West v. Harris,* 573 F.2d 873, 880-81 (5th Cir.1978)) ("When such disputes [over coverage] arise, they are resolved under federal law 'by drawing upon standard insurance law principles' ").

> FN9. During oral argument, Wright argued that if he were to prevail on his extra-contractual claim, the final judgment would be paid by Allstate, not from the public fisc. According to FEMA regulations, the government will reimburse a WYO insurer for litigation expenses as long as the conduct of the insurer is not "*significantly* outside the scope of the Arrangement." 44 C.F.R. Pt. 62, App. A, article III (emphasis added). As the regulations do not define the type of conduct that falls significantly outside the scope of the arrangement, the ultimate decision whether Allstate will be reimbursed rests with FEMA.
>
> In a case similar to Wright's, FEMA made it clear that extra-contractual claims related to the handling

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 4
Slip Copy, 2007 WL 2693087 (C.A.5 (Tex.))
(Cite as: Slip Copy)

of a flood insurance claim would be paid by the federal government. According to FEMA, it "will pay such expenses because in FEMA's judgment it is necessary for the continued functioning of the [flood insurance] program for FEMA to absorb that risk."Therefore, we presume that any amounts awarded to Wright on his extra-contractual claims would more than likely be paid by the federal government.

Faced with the total absence of indicia of Congressional intent to support his position, Wright attempts to rescue his argument by advancing that he is not asking us to create a new cause of action; he argues that federal courts have already recognized federal common law claims for fraud and negligent misrepresentation.[FN10] Yet Wright fails to present a single example of such claims in the context of a hazard insurance policy.[FN10] The only case cited by Wright that does address an insurance contract is *Pence v. United States,* in which the widow of a sole beneficiary of a government-issued *life insurance* policy filed suit against the government to recover the proceeds under the contract.[FN11] The government defended the widow's claim by alleging that her husband had made fraudulent misrepresentations on his policy application.[FN12] *Pence,* a straight life insurance coverage case, does not stand for the proposition that a flood insurance policyholder may bring a federal common law extra-contractual cause of action for fraud in the handling of his flood insurance claim.

> FN10.*See Mallis v. Bankers Trust Co.,* 615 F.Supp. 1158 (2nd Cir .1980) (securities fraud); *In re Adler,* 247 B.R. 51, 116 (S.D.N.Y .1999) (securities fraud); *Marcus v. AT & T Corp.,* 938 F.Supp. 1158 (S.D.N.Y.1996) (Federal Communications Act); *Graham v. Renbrook Sch.,* 692 F.Supp. 102, 108 (D.Conn.1988) (Age Discrimination Act).

> FN11.316 U.S. 332, 333 (1942).

> FN12.*Id.*

Wright nevertheless asks us to conclude-based solely on the language of the SFIP-that Congress intended federal courts to fashion remedies for flood insurance policyholders in addition to those specifically contained in the statute. He cannot, however, provide any support for his assertion that the reference to "federal common law" in the SFIP somehow vests policyholders with the right to bring extra-contractual claims against a WYO insurer. We hold that neither the NFIA nor the SFIP expressly authorizes policyholders to file extra-contractual claims against a WYO insurer.

### 2. Implied Right of Action

**\*4** Wright alternatively asserts that, even if a federal common law cause of action is not expressly provided for in the NFIA or the SFIP, authorization for such a remedy may be implied from the language and purpose of the NFIA. To determine whether we should infer a cause of action when one is not explicitly authorized by Congress, we must answer the four questions posed by the Supreme Court in *Cort v. Ash.*[FN13] The *Cort* questions are: "(1) whether the plaintiff is one of a class for whose especial benefit the statute was enacted; (2) whether there is an indication of legislative intent to create or deny such remedy; (3) Whether such a remedy would be inconsistent with the underlying legislative purpose; and (4) whether the cause of action is one traditionally relegated to state law."[FN14] Cases subsequent to *Cort* have recognzied that all four factors may be important, but the determinative question is whether Congress intended to create a private right of action in favor of the plaintiff.[FN15]

> FN13.422 U.S. 66, 95 (1975).

> FN14.*Till v. Unifirst Federal Sav. & Loan Ass'n,* 653 F.2d 152, 157 (5th Cir.1981) (*citing Cort,* 422 U.S. at 95.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                                          Page 5
Slip Copy, 2007 WL 2693087 (C.A.5 (Tex.))
(Cite as: Slip Copy)

FN15.*California v. Sierra Club,* 451 U.S. 287, 293 (1981) (internal citations omitted).

### a. Especial Beneficiary

The first of *Cort's* questions requires us to determine whether Wright is "one of the class for whose especial benefit the statute was enacted."[FN16] A plaintiff is an "especial beneficiary" if the statute creates a federal right in favor of the particular plaintiff. "[T]he right- or duty-creating language of the statute has generally been the most accurate indicator of the propriety of implication of a cause of action."[FN17] Courts must consider the entire corpus of pertinent law to ensure that any interpretation is consistent with the purposes enunciated by Congress.[FN18]

FN16.*Cort,* 422 U.S. at 78 (internal quotations omitted)

FN17.*Cannon v. Univ. of Chicago,* 441 U.S. 677, 690 n. 13 (1979).

FN18.*Till,* 653 F.2d at 158 n. 13.

Wright asserts that he is the especial beneficiary of the NFIA, because the primary purpose of the act is to benefit homeowners. Diametrically opposed to this contention, however, is our conclusion in *Till v. Unifirst Federal Savings & Loan Ass'n,* that the primary purpose of the NFIA is to reduce the overwhelming burden on the federal treasury.[FN19] In *Till,* borrowers sued a federal savings and loan association based on its failure to require them to obtain flood insurance pursuant to 42 U.S.C. §§ 4012a(b) and 4104a. To determine whether the NFIA afforded such borrowers a private cause of action, we first looked to the statutory language in sections 4012a(b) and 4104a. We found in that language no clear right in favor of the borrowers. Rather, "[t]he statutes merely require lending institutions to notify borrowers of flood plains and require appropriate flood insurance."[FN20] We then looked to the NFIA as a whole and determined that "the principal purpose in enacting the Program was to reduce, by implementation of adequate land use controls and flood insurance, the massive burden on the federal fisc of the ever-increasing federal flood disaster assistance."[FN21] Even though *Till* involved different sections of the NFIA than those implicated here, we perceive no reason why our earlier determination of the Act's purpose should not be applicable in the instant case.

FN19.*Id.* at 159.

FN20.*Id.* at 158.

FN21.*Id.* at 159.

**\*5** Wright nevertheless urges that *Till* was decided incorrectly, insisting that the primary purpose of the NFIA is to benefit policyholders. To support this contention, Wright cites Congressional statements regarding the Housing and Urban Development Act of 1968, which contained the original text of the National Flood Insurance Act. As described by Congress in the Introduction to the Housing and Development Act, the purpose of the Act is to "accelerate progress" in the home market and provide a "suitable living environment for every American family."[FN22] Thus, Wright maintains, Congress clearly envisioned home owners as especial beneficiaries of the bill. The Introduction of the Housing and Urban Development Act does not, however, include a single reference to the NFIA, flood insurance, or hurricanes. We find more convincing the discussion contained in Congressional statements, like those cited in *Till,* that specifically refer to the NFIA.

FN22.H.R. REP. No. 90-1585 (1968), *as reprinted in* 1968 U.S.C.C . A.N. 2873, 2873.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                                Page 6
Slip Copy, 2007 WL 2693087 (C.A.5 (Tex.))
**(Cite as: Slip Copy)**

Wright's second reference is even less convincing. To demonstrate that the NIFA was enacted to benefit policyholders, Wright points to the language contained in the heading of the NFIA, Title XI, in which Congress stated: Heavy losses over the year from hurricanes in the coastal areas and from storms in inland areas of the Nation dramatize the lack of insurance protection against flood damage. Insurance protection against risk of destruction caused by tornadoes and other natural catastrophes is generally available, but is not available against the risk of flood loss.[FN23]

> FN23.*Id.* at 2966.

At first glance this language might appear to support Wright's argument, but it is actually just a part of the language cited in *Till,*[FN24] which goes on to state:

> FN24.*Till,* 653 F.2d at 159 n. 14.

These facts underline the need for a program which will make insurance against flood damage available, encourage persons to become aware of the risk of occupying the flood plains, and *reduce the mounting Federal expenditures for disaster relief assistance.*[FN25]

> FN25.H.R. REP. No. 90-1585 (1968), *as reprinted in* 1968 U.S.C.C . A.N. 2966-67 (emphasis added).

Viewing this statement in its entirety, as we did in *Till,* we remain convinced that the primary purpose of the NFIA is to reduce the financial burden on the federal fisc.

### *b. Legislative Intent*

To answer the second question of the *Cort* analysis, we must examine the legislative history of the statute and determine whether there is Congressional intent to create or deny a private right of action.[FN26]"[I]n cases where the statutes and legislative history are silent on the question of a private remedy, 'implying a private right of action on the basis of congressional silence is a hazardous enterprise, at best.' "[FN27]

> FN26.*Cort v. Ash,* 422 U.S. 66, 78 (1975).

> FN27.*Till,* 653 F.2d at 160 (citing *Touche Ross & Co.,* 442 U . S. 560, 571 (1979).

Wright insists that this requirement is fulfilled, because the SFIP specifically references federal common law as governing claims arising out of the insurance policy. Aside from this language, however, there is no indication in the legislative history or elsewhere that Congress intended to create or permit additional causes of action. Again, that lone reference to federal common law instructs courts to consider standard principles of interpreting insurance contracts when resolving questions regarding the policy's coverage; it is not an invitation to courts to fashion additional remedies or causes of action.[FN28]

> FN28.*Dickerson v. State Farm Fire & Cas. Co.,* Civ. Action No. 06-5181, 2007 WL 1537631, at *2 (E.D.La. May 23, 2007).

**\*6** We deem it significant that Congress expressly provided a private remedy for policyholders in 42 U.S.C. §§ 4053 and 4072. These statutes allow a policyholder to sue in federal court if he is dissatisfied with the amount of a claim payment. That Congress expressly authorized private causes of action in other sections of the NFIA weighs against Wright's theory that Congress implicitly intended the courts to fashion additional causes of action. As the Supreme Court recognized in *Touche Ross & Co. v. Redington,*"when Congress wished to provide a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 2693087 (C.A.5 (Tex.))
(Cite as: Slip Copy)

private damages remedy, it knew how to do so."[FN29]

    FN29.442 U.S. at 572.

### c. Underlying Purpose/State Law Claim

The third and fourth *Cort* questions are relevant only if the answers to the first two indicate Congressional intent to create a private remedy.[FN30] As we find no Congressional intent to allow extra-contractual claims in flood insurance cases, it is unnecessary for us to address the last two questions of the *Cort* test. If we were to do so, however, the answers to the third and fourth questions would not change our conclusion. The third question of the *Cort* test asks whether creating a cause of action would be consistent with the underlying purpose of the legislation. We have already determined that the overarching purpose of the NFIA is to relieve the burden on the federal treasury caused by flood damage. Subjecting the government to extra-contractual claims on flood insurance policies would increase rather than confine the burdens on the federal government and the federal fisc that the NFIA was created to mitigate. Inferring a private right of action would run counter to the underlying purpose of the Act. The last *Cort* question, which recognizes that it may be inappropriate to infer a cause of action based solely on federal law when a state law remedy exists,[FN31] is not applicable in this case, because the NFIA preempts state law claims that arise under federal flood insurance policies.[FN32]

    FN30.*California v. Sierra Club,* 451 U.S. 287, 297 (1981).

    FN31.*Cort,* 422 U.S. at 84.

    FN32.*Wright v. Allstate,* 415 F.3d 384 (5th Cir.2005).

### III. CONCLUSION

Our review of the language of the NFIA and the SFIP reveals no express authorization for a policyholder to bring an extra-contractual claim against a WYO insurer. Neither do we perceive any evidence that Congress implicitly intended that policyholders be able to file claims against WYO insurers other than those specifically provided for in the Act. As Wright's extra-contractual claims for fraud and negligent misrepresentation are neither explicitly nor implicitly authorized by the NFIA, the judgment of the district court is AFFIRMED.

C.A.5 (Tex.),2007.
Wright v. Allstate Ins. Co.
Slip Copy, 2007 WL 2693087 (C.A.5 (Tex.))

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT 3

DECL OF GARY R. GLEASON IN
SUPP. OF DEF.'S MTN TO DISMISS
STATE LAW CLAIMS

Westlaw.

386 F.3d 263                                                                    Page 1
386 F.3d 263
**(Cite as: 386 F.3d 263)**


**C**

C.E.R. 1988, Inc. v. Aetna Cas. and Sur. Co.
C.A.3 (Virgin Islands),2004.

United States Court of Appeals,Third Circuit.
C.E.R. 1988, INC.
v.
THE AETNA CASUALTY AND SURETY COMPANY, Appellant.
**No. 03-2833.**

Argued May 6, 2004.
Filed Oct. 12, 2004.


**Background:** Insured brought action against insurer that administered flood policy issued pursuant to the National Flood Insurance Program, alleging contract and tort causes of action after insurer refused to pay full amount of damage claimed by insured. After parties settled the contract claims, the United States District Court of the Virgin Islands denied insurer's motion for summary judgment on the tort claims, and certified issue for interlocutory appeal.

**Holding:** The Court of Appeals, Ambro, Circuit Judge, held that insured's tort claims based on insurer's administration of federal flood policy were preempted by the National Flood Insurance Act (NFIA).

Reversed.


West Headnotes

**[1] Insurance 217 ⬦1302**

217 Insurance
    217IV Insurance Companies and Related Entities
        217IV(D) Special Types of Entities
            217k1301 Government Sponsored Programs
                217k1302 k. In General. Most Cited Cases
Congress created the National Flood Insurance Program to provide standardized insurance coverage for flood damage at or below actuarial rates. National Flood Insurance Act of 1968, § 1302 et seq., 42 U.S.C.A. § 4001 et seq.

**[2] Insurance 217 ⬦1302**

217 Insurance
    217IV Insurance Companies and Related Entities
        217IV(D) Special Types of Entities
            217k1301 Government Sponsored Programs
                217k1302 k. In General. Most Cited Cases
National Flood Insurance Program was intended to minimize costs to taxpayers by limiting the damage caused

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

by flood disasters through prevention and protective measures. National Flood Insurance Act of 1968, § 1302 et seq., 42 U.S.C.A. § 4001 et seq.

**[3] Insurance 217 ☞1110**

217 Insurance
    217III What Law Governs
        217III(B) Preemption; Application of State or Federal Law
            217k1102 Particular Laws or Activities
                217k1110 k. Federal Insurance Programs. Most Cited Cases

**States 360 ☞18.41**

360 States
    360I Political Status and Relations
        360I(B) Federal Supremacy; Preemption
            360k18.41 k. Insurance. Most Cited Cases
States have no regulatory control over the National Flood Insurance Program's operations. National Flood Insurance Act of 1968, § 1302 et seq., 42 U.S.C.A. § 4001 et seq.

**[4] Insurance 217 ☞1805**

217 Insurance
    217XIII Contracts and Policies
        217XIII(G) Rules of Construction
            217k1805 k. In General. Most Cited Cases

**Insurance 217 ☞1822**

217 Insurance
    217XIII Contracts and Policies
        217XIII(G) Rules of Construction
            217k1822 k. Plain, Ordinary or Popular Sense of Language. Most Cited Cases

**Insurance 217 ☞2209**

217 Insurance
    217XVI Coverage--Property Insurance
        217XVI(C) Flood Insurance
            217k2209 k. In General. Most Cited Cases
Court of Appeals interprets the flood insurance policy in accordance with its plain, unambiguous meaning, remaining cognizant that its interpretation should be uniform throughout the country and that coverage should not vary from state to state. National Flood Insurance Act of 1968, § 1302 et seq., 42 U.S.C.A. § 4001 et seq.

**[5] Insurance 217 ☞1110**

217 Insurance
    217III What Law Governs

386 F.3d 263
386 F.3d 263                                                        Page 3
(Cite as: 386 F.3d 263)


217III(B) Preemption; Application of State or Federal Law
   217k1102 Particular Laws or Activities
      217k1110 k. Federal Insurance Programs. Most Cited Cases

**States 360 &rlhar;18.41**

360 States
   360I Political Status and Relations
      360I(B) Federal Supremacy; Preemption
         360k18.41 k. Insurance. Most Cited Cases
Insured's state law tort claims based on private insurer's administration of federal flood policy issued pursuant to the National Flood Insurance Program were preempted by the National Flood Insurance Act (NFIA); overarching purpose of the Program, to provide affordable flood insurance in high-risk areas in order to reduce pressures on the federal fisc, would have been compromised by state court interference. National Flood Insurance Act of 1968, § 1302 et seq., 42 U.S.C.A. § 4001 et seq.

**[6] States 360 &rlhar;18.11**

360 States
   360I Political Status and Relations
      360I(B) Federal Supremacy; Preemption
         360k18.11 k. Congressional Intent. Most Cited Cases
Consideration under the Supremacy Clause starts with the basic assumption that Congress did not intend to displace state law. U.S.C.A. Const. Art. 6, cl. 2.

**[7] States 360 &rlhar;18.9**

360 States
   360I Political Status and Relations
      360I(B) Federal Supremacy; Preemption
         360k18.9 k. Federal Administrative Regulations. Most Cited Cases

**States 360 &rlhar;18.11**

360 States
   360I Political Status and Relations
      360I(B) Federal Supremacy; Preemption
         360k18.11 k. Congressional Intent. Most Cited Cases
Federal law expressly preempts state law when a statute or regulation contains explicit language to that effect. U.S.C.A. Const. Art. 6, cl. 2.

**[8] States 360 &rlhar;18.7**

360 States
   360I Political Status and Relations
      360I(B) Federal Supremacy; Preemption
         360k18.7 k. Occupation of Field. Most Cited Cases

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

386 F.3d 263
386 F.3d 263
(Cite as: 386 F.3d 263)

"Field preemption" exists if federal law so thoroughly occupies a legislative field as to make reasonable the inference that Congress left no room for the States to supplement it. U.S.C.A. Const. Art. 6, cl. 2.

**[9] States 360 ⏂18.5**

360 States
    360I Political Status and Relations
        360I(B) Federal Supremacy; Preemption
            360k18.5 k. Conflicting or Conforming Laws or Regulations. Most Cited Cases
"Conflict preemption" occurs when (1) it is impossible to comply with both the state and the federal law, or (2) when the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. U.S.C.A. Const. Art. 6, cl. 2.

**[10] States 360 ⏂18.11**

360 States
    360I Political Status and Relations
        360I(B) Federal Supremacy; Preemption
            360k18.11 k. Congressional Intent. Most Cited Cases
A court will deem state law preempted only if that is the clear and manifest purpose of Congress. U.S.C.A. Const. Art. 6, cl. 2.

**[11] Insurance 217 ⏂1302**

217 Insurance
    217IV Insurance Companies and Related Entities
        217IV(D) Special Types of Entities
            217k1301 Government Sponsored Programs
                217k1302 k. In General. Most Cited Cases
Central purpose of the National Flood Insurance Program is to reduce fiscal pressure on federal flood relief efforts. National Flood Insurance Act of 1968, § 1302 et seq., 42 U.S.C.A. § 4001 et seq.

**[12] Constitutional Law 92 ⏂976**

92 Constitutional Law
    92VI Enforcement of Constitutional Provisions
        92VI(C) Determination of Constitutional Questions
            92VI(C)2 Necessity of Determination
                92k976 k. Resolution of Non-Constitutional Questions Before Constitutional Questions. Most Cited Cases
    (Formerly 92k46(1))
Courts ordinarily should not pass on constitutional questions when a decision may be reached on non-constitutional grounds.

**[13] Constitutional Law 92 ⏂976**

92 Constitutional Law

386 F.3d 263
386 F.3d 263
**(Cite as: 386 F.3d 263)**

92VI Enforcement of Constitutional Provisions
    92VI(C) Determination of Constitutional Questions
        92VI(C)2 Necessity of Determination
            92k976 k. Resolution of Non-Constitutional Questions Before Constitutional Questions. Most Cited
Cases
    (Formerly 92k46(1))
Preemption is treated as "statutory" for purposes of Court of Appeals' practice of deciding statutory claims first
to avoid unnecessary constitutional adjudications.

**\*265** Gerald J. Nielsen, (Argued), Metairie, LA, for Appellant.

Francis J. D'Eramo, Nancy V. Young, (Argued), Nichols, Newman, Logan & D'Eramo, Christiansted, St. Croix,
USVI, for Appellee.

Before BARRY, AMBRO, and SMITH, Circuit Judges.

AMBRO, Circuit Judge.
We address in this appeal whether the National Flood Insurance Program (the "Program") is sufficiently com-
prehensive to preempt a state tort suit arising from conduct related to the Program's administration. We conclude
that the overarching purpose of the Program-to provide affordable flood insurance in high-risk areas in order to
reduce pressures on the federal fisc-would be compromised by state court interference. Thus the plaintiff's state
law tort claims are preempted.

### Factual and Procedural History

The Program is administered by the Federal Emergency Management Agency ("FEMA") pursuant to the Nation-
al Flood Insurance Act of 1968 ("NFIA"), 42 U.S.C. § 4001, *et seq.* C.E.R. 1988, Inc. ("C.E.R.") seeks state law
remedies for improper handling of the Program's Standard Flood Insurance Policy (the "Policy") issued in favor
of C.E.R. by defendant Aetna Casualty and Surety Company ("Aetna"). Aetna is a "Write-Your-Own" ("WYO")
insurance company, meaning that it is a private insurer authorized by FEMA to provide Policies in its own
name. It collects premiums in segregated accounts, from which it pays claims and issues refunds. When the
funds are inadequate (as frequently occurs), Aetna pays claims by drawing on letters of credit issued by the
United States Treasury.

C.E.R. purchased a Policy from Aetna to cover Hamilton House, a property in St. Croix. In September 1995 the
property was damaged by flooding during Hurricane Marilyn. C.E.R. received an insurance payment of
$200,000 as a result of damage to Hamilton House. One year later, in September 1996, the facility again was
damaged by flood waters, this time during Hurricane Hortense. C.E.R. filed a claim for $716,916, but the re-
ceipts it submitted in conjunction with the claim, documenting repairs made since Hurricane Marilyn, totaled
under $20,000.

Given the disparity between the claim amount and the receipt totals, Aetna required C.E.R. to submit a
"Comparison Estimate" detailing when the relevant damage occurred. The Comparison Estimate, prepared by an
architect, reported new losses of $325,300.55 resulting from Hurricane Hortense. Nonetheless, Aetna's adjust-
ment company refused to consider the estimate and recommended payment in the amount of $25,177.61, minus
a $750 deductible. C.E.R. refused the settlement, and Aetna closed its file on the claim, without payment, in
March 1997.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

386 F.3d 263
386 F.3d 263
**(Cite as: 386 F.3d 263)**

Page 6

In 1997 C.E.R. filed a seven-count complaint against Aetna, alleging contract and tort causes of action, in the United States District Court of the Virgin Islands. Aetna subsequently hired a second adjustment *266 company, which estimated C.E.R.'s losses at $263,757.58. In February 1998 the parties settled C.E.R.'s contract claims for $278,392. Thus only C.E.R.'s tort claims remain. They allege negligent adjustment of C.E.R.'s insurance claim resulting in lost income and business opportunities, tortious bad faith conduct, and outrageous and reckless conduct entitling C.E.R. to punitive damages. C.E.R. also seeks attorney's fees and costs.

In January 2000, Aetna moved for summary judgment on these claims alleging, among other defenses, that C.E.R.'s territorial law tort claims are preempted by federal law. The District Court denied Aetna's motion, holding that the tort claims were not preempted and that a genuine issue of material fact existed as to whether Aetna had acted in bad faith. Aetna filed a motion for reconsideration of the preemption issue. As an alternative request for relief, it asked the District Court to certify the question for interlocutory appeal in accordance with 28 U.S.C. § 1292(b). The District Court pursued that course. We granted Aetna's petition for permission to appeal in May 2003.[FN1]

> FN1. Our standard of review is plenary. *Van Holt v. Liberty Mut. Fire Ins. Co.,* 163 F.3d 161, 167 (3d Cir.1998) (on rehearing).

### Discussion

Our preemption analysis turns on congressional intent. We must determine whether the purposes of the Program will be jeopardized if disputes involving federal flood insurance policies are governed by state law.[FN2] Because we have examined this issue in a previous case, *Van Holt v. Liberty Mutual Fire Insurance Co.,* 163 F.3d 161 (3d Cir.1998) (on rehearing), our role today is limited. Although we left open in *Van Holt* the question of whether the NFIA preempts state law, *id.* at 169 n. 6, our reasoning in that case leads us to answer in the affirmative.

> FN2. Because this decision is not specific to the Virgin Islands, we discuss the tensions between federal and state law rather than territorial law. Our analysis, of course, also extends to the latter.

## I. Overview of the National Flood Insurance Program

[1][2] Congress created the Program to provide standardized insurance coverage for flood damage at or below actuarial rates. *Gowland v. Aetna,* 143 F.3d 951, 953 (5th Cir.1998). Prior to its enactment, few insurance companies offered flood insurance because private insurers were unable profitably to underwrite flood policies. The Program was intended to minimize costs to taxpayers by "limit[ing] the damage caused by flood disasters through prevention and protective measures." *Van Holt,* 163 F.3d at 165. It is operated by FEMA and supported by the federal Treasury. *Id.* at 165 n. 2. The Program encompasses 4.5 million policies aggregating $500 billion dollars of coverage.

In its early years, the Program was administered under what is known as "Part A" of the NFIA. A pool of private insurance companies issued policies and shared the underwriting risk, with financial assistance from the federal Government. As of January 1, 1978, however, the Government bears full responsibility for the Program pursuant to 42 U.S.C. § 4071. Under "Part B" of the NFIA, FEMA "carr[ies] out the program of flood insurance authorized under [the NFIA] through the facilities of the Federal Government." *Id.* The Program is funded through the National Flood Insurance Fund established by FEMA in the United States Treasury.

*267 [3][4] Congress authorized FEMA to "prescribe regulations establishing the general method or methods by

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

386 F.3d 263                                                                                          Page 7
386 F.3d 263
**(Cite as: 386 F.3d 263)**

which proved and approved claims for losses may be adjusted and paid for any damage to or loss of property
which is covered by flood insurance." 42 U.S.C. § 4019. The resulting regulatory scheme is set out at 44 C.F.R.
§§ 61.1-78.14. States have no regulatory control over the Program's operations.[FN3] *Linder & Assocs. Inc. v.
Aetna Cas. & Sur. Co.,* 166 F.3d 547, 550 (3d Cir.1999) ("It is well settled that federal common law governs the
interpretation of [Policies]. Accordingly, neither the statutory nor decisional law of any particular state is applic-
able to the case at bar.... [W]e interpret the [Policy] in accordance with its plain, unambiguous meaning, remain-
ing cognizant that its interpretation should be uniform throughout the country and that coverage should not vary
from state to state.") (quotations omitted).

> FN3. The insurance industry in the United States operates in interstate commerce. States may regulate
> the insurance industry only to the extent Congress permits. U.S. Const. art. I, § 8, cl. 3. The McCarren-
> Ferguson Act, 15 U.S.C. § 1011, *et seq.,* grants states this power except where Congress enacts legisla-
> tion that "specifically relates to the business of insurance." 15 U.S.C. § 1012(b). In *Barnett Bank of
> Marion County v. Nelson,* 517 U.S. 25, 116 S.Ct. 1103, 134 L.Ed.2d 237 (1996), the Supreme Court
> held that the exception for acts relating to the business of insurance should be construed broadly, noting
> that "[t]he word 'relates' is highly general." *Id.* at 38, 116 S.Ct. 1103. Without doubt the NFIA is con-
> gressionally-enacted legislation relating to the business of insurance.

Pursuant to 42 U.S.C. § 4081(a), FEMA created the WYO program whereby Policies may be issued by private
insurers like Aetna. Though FEMA may issue Policies directly, more than 90% are written by WYO companies.
These private insurers may act as "fiscal agents of the United States,"42 U.S.C. § 4071(a)(1), but they are not
general agents. Thus they must strictly enforce the provisions set out by FEMA and may vary the terms of a
Policy only with the express written consent of the Federal Insurance Administrator. 44 C.F.R. §§ 61.4(b),
61.13(d) & (e), 62.23(c) & (d). In essence, the insurance companies serve as administrators for the federal pro-
gram. It is the Government, not the companies, that pays the claims. And when a claimant sues for payment of a
claim, "the responsibility for defending claims will be upon the Write Your Own Company and defense costs
will be part of the ... claim expense allowance."[FN4] 44 C.F.R. § 62.23(i)(6).

> FN4. 42 U.S.C. § 4072 authorizes suit against the FEMA Director upon the disallowance of a claim. By
> regulation, the WYO company is sued in place of the FEMA Director.

Our Court recently evaluated the NFIA in *Van Holt.*In light of the strong federal interests intertwined with the
administration of the Program, we concluded that federal courts are the appropriate and exclusive arbiters of
Policy-related disputes.

As noted, *Van Holt* is markedly similar to today's case. The plaintiff in *Van Holt* filed successive claims with its
WYO insurance provider, Liberty Mutual, for flood damage. Liberty Mutual concluded that the claims were
fraudulent and refused to approve the damages claimed from the second flood. The Van Holts sued Liberty Mu-
tual in the United States District Court for the District of New Jersey, alleging that it had committed state law
torts. Our Court initially held that the District Court lacked subject matter jurisdiction over the state law claims.
On rehearing, however, we reversed path, concluding that the District Court had jurisdiction. 163 F.3d at 167.

**\*268** Our decision turned on the collapse of two distinctions. First, we declined to distinguish between suits
against FEMA, over which jurisdiction plainly existed, and suits against WYO companies. Though the language
of the statute speaks explicitly only of suits against FEMA, we held that "a suit against a WYO company is the
functional equivalent of a suit against FEMA,"*id.* at 166, because a WYO company is a fiscal agent of the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

United States. 42 U.S.C. § 4071(a)(1). Moreover, "FEMA regulations require a WYO company to defend claims but assure that FEMA will reimburse the WYO company for defense costs." *Van Holt,* 163 F.3d at 166 (citing 44 C.F.R. § 62.23(i)(6)). Second, we held that district courts have original exclusive jurisdiction over cases arising from improper handling of Policy claims even if they "do[ ] not explicitly allege that [the WYO carrier] violated the insurance policy contract." *Id.* at 167. We emphasized that the causes of action in that case, though they "sound[ed] in tort," alleged "impropriety in the investigation and adjustment of [the] insurance claim" and therefore were "intimately related to the disallowance of the[ ] insurance claim." *Id.* Put differently, we reasoned that a claim may sound in tort but nonetheless be one in contract.

After concluding that federal jurisdiction was proper, we affirmed in *Van Holt* the District Court's award of summary judgment to Liberty Mutual on the merits. *Id.* at 168-69. Although the issue was briefed, we declined to decide whether the NFIA preempts state law claims related to an insurance contract. *Id.* at 169 n. 6.

That issue is back and squarely before us today. We must determine whether the federal goals of uniform affordable flood insurance and reduced aggregate pressure on the federal Treasury, which informed our decision in *Van Holt,* counsel extension of our holding in that case to preclude interference with Policies not only by state courts, but also by state law.[FN5]

> FN5. We note that the immediate effect of our decision is limited, as a relevant Policy provision has since been changed. FEMA National Flood Insurance Program, 65 Fed.Reg. 60,758, 60,767 (Oct. 12, 2000) (codified at 44 C.F.R. pt. 61, app. A(1), art. IX). A new regulation, which took effect on December 31, 2000, amends an insured's Policy to include language providing that "all disputes arising from the handling of any claim under the policy are governed exclusively by the flood insurance regulations issued by FEMA, the National Flood Insurance Act of 1968, as amended (42 U.S.C. § 4001, *et seq.*) and Federal common law." *Id.*

## II. Preemption

[5] The reasoning of our decision in *Van Holt* compels the conclusion that state-law claims are preempted by the NFIA. The uniformity touted in that decision would be seriously jeopardized if state tort claims were permitted to proceed, even if those claims were resolved in federal court. We reasoned there that "Congress would want federal courts to adjudicate disputes over federal flood insurance policies for which the federal government would be responsible." *Van Holt,* 163 F.3d at 167. By the same token, Congress would want federal law to govern those disputes. And what Congress intends is the crux of our preemption analysis.

[6] " 'Consideration under the Supremacy Clause starts with the basic assumption that Congress did not intend to displace state law.' " *Bldg. & Const. Trades Council of Metro. Dist. v. Assoc. Builders & Contractors of Mass./R.I., Inc.,* 507 U.S. 218, 224, 113 S.Ct. 1190, 122 L.Ed.2d 565 (1993) (quoting *\*269Maryland v. Louisiana,* 451 U.S. 725, 746, 101 S.Ct. 2114, 68 L.Ed.2d 576 (1981)). The Court may nonetheless conclude that the Program preempts state law under one or more of three theories: express preemption, field preemption (sometimes referred to as "implied preemption"), and conflict preemption. *Green v. Fund Asset Mgmt., L.P.,* 245 F.3d 214, 222 (3d Cir.2001). This case falls squarely within the third category.

[7] It is easy to glean that federal law expressly preempts state law when a statute or regulation contains explicit language to that effect. *Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, 383, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992). But when C.E.R. purchased its Policy, no express provision existed.[FN6] Thus C.E.R.'s claims under review are not expressly preempted. *See, e.g., Scherz v. S.C. Ins. Co.,* 112 F.Supp.2d 1000, 1004-05

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

386 F.3d 263
386 F.3d 263
**(Cite as: 386 F.3d 263)**

(C.D.Cal.2000); *Spence v. Omaha Indem. Ins. Co.,* 996 F.2d 793, 796 n. 20 (5th Cir.1993).

> FN6. Arguably the Policy now contains such a provision. The amended provision reads: "This policy and all disputes arising from the handling of any claim under the policy are governed exclusively by the flood insurance regulations issued by FEMA, the National Flood Insurance Act of 1968, as amended (42 U.S.C. § 4001, *et seq.*), and Federal common law." 44 C.F.R. pt. 61, app. A(1), art. IX (2002). The principal differences between the current provision and its predecessor are the addition of the term "exclusively" and the express inclusion of disputes arising from claims handling. *Cf.*44 C.F.R. pt. 61, app. A(1), art. X (1985) ("This policy is governed by the flood insurance regulations issued by FEMA, the National Flood Insurance Act of 1968, as amended (42 U.S.C. § 4001, *et. seq.*) and Federal common law.").

[8] While a stronger case, we decline also to rely on field preemption. This form of preemption exists if "federal law so thoroughly occupies a legislative field as to make reasonable the inference that Congress left no room for the States to supplement it."*Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 516, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992) (internal quotations and citation omitted). The Fifth Circuit Court of Appeals opined in the seminal case of *West v. Harris,* 573 F.2d 873 (5th Cir.1978), that "Congress has undertaken to establish a comprehensive flood insurance program under the control of [FEMA] to achieve policies national in scope." *Id.* at 881-82.While the case predates Part B of the statute, its reasoning is only more persuasive given the expansion of federal involvement in the Program.<sup>FN7</sup> But because conflict preemption is the narrower and, we believe, clearer path, we do not decide whether Congress has sought to occupy the field of federal flood insurance.

> FN7. In *West,* the Court deemed the plaintiff's case preempted on this basis. However, *West*"did not expressly address whether the NFIA preempts independent state law tort claims; it only ruled on the availability of a state-based remedy for what is directly justiciable under the NFIA, i.e., a breach of contract claim." *Scherz,* 112 F.Supp.2d at 1006. The holding in *West* encompassed only "the statutory penalty and attorney's fees allowed by state insurance law for arbitrary denial of coverage." *West,* 573 F.2d at 881. More importantly, our Court never adopted *West' s* rule before or after the statute was amended.

[9][10] Conflict preemption, the final form, occurs "when [1] it is impossible to comply with both the state and the federal law, or [2] when the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Green,* 245 F.3d at 222 (citation omitted). Despite the generality of this language, the Supreme Court has urged caution in its application: "[B]ecause the States are independent sovereigns in our federal system, we have long presumed that Congress does not cavalierly pre-empt state-law causes of action." *Medtronic, Inc. v. Lohr,* 518 U.S. 470, 485, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996). A *270 court will deem state law preempted only if that is the "clear and manifest purpose of Congress." *Id.* (internal quotations and citation omitted).

Thus the first step in determining whether C.E.R.'s claims are preempted is to evaluate the statute and regulations for evidence of congressional intent. We begin by examining the first, narrower prong of conflict preemption: state law is preempted when it would be impossible simultaneously to comply with state and federal law. In this context, we note that the standards used to analyze ordinary insurance claims differ from those applied to Policy claims. In the realm of private insurance, common law doctrines (such as "reasonable expectations," "notice/prejudice," and "substantial compliance") govern the evaluation of claims. By contrast, a WYO insurer must strictly follow the claims processing standards set out by the federal Government.

386 F.3d 263
386 F.3d 263
**(Cite as: 386 F.3d 263)**

The important consequence is that a WYO insurer may be unable to comply both with state law and with the federal guidelines that it is bound to follow. In these cases, state law is preempted. C.E.R. has not, however, alleged that Aetna followed federal law in violation of a conflicting state law doctrine. On the contrary, it has argued that Aetna *failed* to comply with a federal requirement-specifically, the requirement that "the [c]ompany's [c]laims [d]epartment verifies the correctness of the coverage interpretations and reasonableness of the payments recommended by the adjusters." 44 C.F.R. § 62.23(i)(2).

[11] Accordingly, we rely instead on the second variation of conflict preemption: we conclude that the application of state tort law would impede Congress's objectives. Indisputably a central purpose of the Program is to reduce fiscal pressure on federal flood relief efforts. *See, e.g., Till v. Unifirst Fed. Sav. & Loan Ass'n.,* 653 F.2d 152, 159 (5th Cir.1981) ("Clearly, the principal purpose in enacting the Program was to reduce, by implementation of adequate land use controls and flood insurance, the massive burden on the federal fisc of the ever-increasing federal flood disaster assistance."). State tort suits against WYO companies, which are usually expensive, undermine this goal.[FN8] Allowing suits to proceed, Aetna contends, results in one of two consequences-both bad. If FEMA refused to reimburse WYO carriers for their defense costs, insurers would leave the Program, driving the price of insurance higher. The alternative, remuneration for losses incurred in such suits, would directly burden the federal Treasury.[FN9] And, indeed, our decision in *Van Holt* relied on the belief that "FEMA reimburses the WYO companies for their defense costs." *Van Holt,* 163 F.3d at 165.

> FN8. To be sure, the federal Government also has an interest in preventing fraud by its insurers. But because a WYO insurer profits by *paying* a claim, the ordinary rationale for state tort law is largely inapplicable to the Program's context. WYO insurers act as "fiduciary" or "fiscal" agents of the United States. 42 U.S.C. § 4071(a)(1). They receive a flat 3.3% commission on all claims paid.

> FN9. Congress has authorized reimbursement for "cost[s] incurred in the adjustment and payment of any claims for losses." 42 U.S.C. § 4017(d)(1). Moreover, pursuant to 44 C.F.R. § 62.23(i)(6), "the responsibility for defending claims will be upon the Write Your Own Company and defense costs will be part of the unallocated or allocated claim expense allowance...."

Our understanding that expensive litigation will draw on federal funds is confirmed by FEMA's regulations and policies interpreting and implementing the NFIA. Congress statutorily authorized FEMA to enter into "arrangements" with private insurance*271 companies. 42 U.S.C. §§ 4071(a)(1), 4081(a). FEMA, in turn, specified the terms of these Arrangements in the regulations governing the Program. Among other things, the Arrangement in effect when C.E.R. purchased its Policy provided that FEMA could reimburse a WYO company for "payments as a result of awards or judgments for punitive damages arising under the scope of this Arrangement and policies of flood insurance issued pursuant to this Arrangement provided that prompt notice of any claim for punitive damages [was submitted]." 44 C.F.R. pt. 62, app. A, art. III(D) (1985). The Write-Your-Own Claims Manual issued by FEMA to WYO companies also provided explicitly that the Government would reimburse a WYO company for punitive damages under appropriate circumstances. FEMA, Write-Your-Own Claims Manual 19 (1986 ed.). Thus it appears that FEMA ordinarily will be responsible financially for the costs of defending a lawsuit against a WYO company.[FN10] The efficiency goals of the Program, on balance, would better be served by requiring claimants to resolve their disputes by means of the remedies FEMA provides.[FN11]

> FN10. Relying on these and similar provisions, C.E.R. argues that FEMA anticipated that WYO insurers would be sued under *state* law for actions arising from their administration of Policies. We reject C.E.R.'s approach because we see no reason why litigation based on improper claims-handling must

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

386 F.3d 263                                                                                                          Page 11
386 F.3d 263
**(Cite as: 386 F.3d 263)**

mean state law litigation. In fact, the updated Policy set out at 44 C.F.R. pt. 61, app. A(1), indicates the contrary interpretation. In its current form, the Policy appears explicitly to preempt state law tort suits, 44 C.F.R. pt. 61, app. A(1), art. IX (2002), but nonetheless contemplates that lawsuits against FEMA and WYO insurers may proceed. Article VII.R provides: "If you [sue us], you must start the suit within one year of the date of the written denial of all or part of the claim, and you must file the suit in the United States District Court of the district in which the insured property was located at the time of loss." 44 C.F.R. pt. 61, app. A(2), art. VII(R). Moreover, 44 C.F.R. pt. 62, app. A, art. III(D)(2) specifies that FEMA will reimburse a WYO company for "payments as a result of litigation [that arise] under the scope of this Arrangement." In other words, we see no inconsistency in holding that FEMA envisioned that claimants could sue WYO insurers, but intended federal law to govern those disputes.

   FN11. This reasoning is bolstered by FEMA's express statements to this Court in its *amicus* brief in *Van Holt.* While the *Van Holt amicus* brief was produced in conjunction with litigation rather than a rulemaking, the Supreme Court has deemed appellate briefs worthy of deference. *Geier v. Am. Honda Motor Co.,* 529 U.S. 861, 883-84, 120 S.Ct. 1913, 146 L.Ed.2d 914 (2000) ("[T]he agency's own views should make a difference. We have no reason to suspect that the Solicitor General's representation of [the agency's] views reflects anything other than 'the agency's fair and considered judgment on the matter.' The failure of the Federal Register to address pre-emption is thus not determinative.") (citation omitted). *Cf. Horn v. Thoratec Corp.,* 376 F.3d 163, 177 (3d Cir.2004) ("Our preemption conclusion is reenforced by the informed analysis found in the FDA's *amicus curiae* brief."). FEMA's *amicus* brief in *Van Holt* principally addressed the disruption to the Program that would result from concurrent jurisdiction, but it also noted the importance of uniformity in the law. Brief for FEMA at 8-9, *Van Holt* (No. 97-5098), *available at* 1998 WL 34104122 ("Under the Panel's reasoning, the 50 States would become co-administrators of the program along with FEMA, a result Congress plainly did not intend when it enacted § 4019 vesting such administrative power in FEMA, and when it specifically amended § 4072 to make federal jurisdiction exclusive....").

[12][13] This analysis is consistent with the decisions of other courts.<sup>FN12</sup> But we can *272 reach the same result by a straighter path-we can simply extrapolate from our decision in *Van Holt.* The reasoning proceeds as follows. First, no one disputes that federal law preempts state contract law with respect to the interpretation of Policy language. *Linder & Assocs. Inc. v. Aetna Cas. & Sur. Co.,* 166 F.3d 547, 550 (3d Cir.1999) ("It is well settled that federal common law governs the interpretation of [Policies]."). We need make only one logical step to extend this rule to the case at hand-namely, we must hold that a tort claim of the kind alleged by C.E.R. is equivalent to a contractual claim that turns on the interpretation of a Policy. That step we have already taken. *Van Holt* held that a state claim "sounding in tort" but "intimately related to the disallowance of [an] insurance claim" is essentially a contractual claim and therefore within the exclusive jurisdiction of the federal courts.FN13 163 F.3d at 167.

   FN12. The vast majority of courts have found that the NFIA preempts state law. *Gibson v. Am. Bankers Ins. Co.,* 289 F.3d 943, 949 (6th Cir.2002) ("[M]ost courts have consistently found that NFIA preempts state law claims that are based on the handling and disposition of [Policy] claims."). The most notable exception is *Spence v. Omaha Indem. Ins.,* 996 F.2d 793 (5th Cir.1993). That case, however, arose from misrepresentation in the *procurement* of a Policy. Our case, by contrast, involves misrepresentation in the *adjustment* of a claim made under a Policy. Several courts have distinguished *Spence* on this basis. *See, e.g., Messa v. Omaha Prop. & Cas. Ins. Co.,* 122 F.Supp.2d 513, 521 (D.N.J.2000) ("Policy procurement is an entirely different creature than claims handling"). We need not decide today whether a

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

386 F.3d 263
386 F.3d 263
**(Cite as: 386 F.3d 263)**

Page 12

case alleging misrepresentation in claims procurement would also be preempted.

FN13. We do not consider Aetna's argument that enforcement of a tort judgment against a WYO company would violate the Appropriations Clause of the United States Constitution, art. I, § 9, cl. 7, because it would burden a program enacted and funded by Congress. Courts ordinarily should not pass on constitutional questions when a decision may be reached on non-constitutional grounds. *Escambia County v. McMillan,* 466 U.S. 48, 51, 104 S.Ct. 1577, 80 L.Ed.2d 36 (1984). While preemption derives from the Supremacy Clause and thus is formally a "constitutional question," *Chi. & N.W. Transp. Co. v. Kalo Brick & Tile Co.,* 450 U.S. 311, 317, 101 S.Ct. 1124, 67 L.Ed.2d 258 (1981), "the basic question involved in [preemption claims] is never one of interpretation of the Federal Constitution but inevitably one of comparing two statutes." *Swift & Co. v. Wickham,* 382 U.S. 111, 120, 86 S.Ct. 258, 15 L.Ed.2d 194 (1965). Thus we treat preemption as " 'statutory' for purposes of our practice of deciding statutory claims first to avoid unnecessary constitutional adjudications." *N.J. Payphone Ass'n v. Town of West New York,* 299 F.3d 235, 239 n. 2 (3d Cir.2002) (quoting *Douglas v. Seacoast Prods., Inc.,* 431 U.S. 265, 272, 97 S.Ct. 1740, 52 L.Ed.2d 304 (1977)).

No similar exception applies to the Appropriations Clause, which-though it may entail analysis of a statute-is an unsettled area of constitutional law. *See, e.g., Maryland Dep't of Human Res. v. United States Dep't of Agric.,* 976 F.2d 1462, 1485-86 (4th Cir.1992) (Hall, J., dissenting) ("[C]onstitutional questions will not be decided unless absolutely necessary to a decision of the case.... The majority offers no reason why this prudential constraint should be ignored in the case before us. Indeed, although I express no opinion on the merits of the majority's analysis of the Appropriations Clause, it appears to me that this area of the law is far from settled. The uncertainty surrounding the issue counsels even greater restraint.") (quotations omitted). In deciding preemption, we look principally to the text of the statute and to congressional intent. By contrast, the boundaries of Appropriations Clause analysis are as yet undeveloped. A decision for Aetna based on the Appropriations Clause would create new law; our preemption decision applies existing law to a regulatory framework.

### Conclusion

We conclude that C.E.R.'s claims, based on territorial tort law, are incompatible with the objectives of the NFIA and therefore are preempted. We thus reverse the District Court's denial of summary judgment to Aetna and remand to the Court to dismiss with prejudice C.E.R.'s tort claims.

C.A.3 (Virgin Islands),2004.
C.E.R. 1988, Inc. v. Aetna Cas. and Sur. Co.
386 F.3d 263

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.