UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

STEFANIE COOK and NATHANIEL COOK,   )   No. C-07-4042 SC
                                    )
             Plaintiffs,            )
                                    )   MEMORANDUM OF
                                    )   DECISION, FINDINGS OF
     v.                             )   FACT, AND CONCLUSIONS
                                    )   OF LAW
                                    )
USAA GENERAL INDEMNITY COMPANY, and )
DOE 1 through DOE 100, inclusive,   )
                                    )
             Defendants.            )
                                    )
_____)

**I.    INTRODUCTION**

     This suit arises out of a breach of a flood insurance policy
held by Plaintiffs Stefanie Cook ("S. Cook") and Nathaniel Cook
("N. Cook," or collectively the "Cooks").  See Compl., Docket No.
1.  The Cooks' home was damaged in a flood that took place in the
town of Ross, California, on December 31, 2005.  The Cooks brought
this suit against USAA General Indemnity Co. ("USAA" or
"Defendant"), alleging that USAA breached the terms of a flood
insurance contract between the parties, and that USAA further
breached its covenant of good faith and fair dealing.  Id. ¶¶ 4-
21.  This Court issued a judgment on the pleadings for USAA as to
the second cause of action.  Docket No. 42.  The Court held a
three-day bench trial from April 27, 2009, to April 29, 2009, as
to the contract claim.  Both parties submitted post-trial briefs

United States District Court

For the Northern District of California

on damages.  Docket Nos. 88, 90.

The Court by this memorandum of decision issues its findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.  For the reasons set forth below, the Court concludes that the Cooks incurred damage to their home that was covered by the policy purchased from USAA, for which USAA has not yet issued payment.  The Cooks are entitled to recover an additional $52,690.24 from USAA, for damage to their home that was directly caused by the flood.

**II.   FINDINGS OF FACT**

    **A.   The Parties**

1.  USAA is a Write Your Own ("WYO") Carrier participating in the United States Government's National Flood Insurance Program ("NFIP"), pursuant to the National Flood Insurance Act of 1968, as amended.  42 U.S.C. 4001, et seq.

2.  The Cooks own a house located at 83 Shady Lane, Ross, California ("the house").

    **B.   The Policy**

3.  USAA issued to the Cooks a NFIP Standard Flood Insurance Policy for the house, bearing policy number 03016 60 68 0F, effective June 30, 2005 through June 30, 2006.  Compl. Ex. 1 ("SFIP") at 1.  The policy was in effect at the time of the flood (discussed infra).  See id.  The terms of the policy are fixed by 44 C.F.R. Pt. 61, App. A(1) (2005).

4.  USAA issued the SFIP to the Cooks in its capacity as the fiscal agent of the United States, pursuant to its

United States District Court
For the Northern District of California

participation in the NFIP as one of FEMA's WYO Program insurance

carriers.  <u>See</u> 44 C.F.R. § 62.23 <u>et seq.</u>

     5.   The Cooks' policy limits are $250,000 for the

building (with a $5000 deductible), and $100,000 for contents

(with a separate $5000 deductible).   SFIP at 1.

     6.   Pursuant to the terms of the SFIP, USAA will pay the

Cooks "for direct physical loss by or from flood."  <u>Id.</u> art. I,

III.A.

     7.   The terms of the SFIP require the Cooks to prepare

certain documents and inventories in order to receive payment.

Article VII(J) of the SFIP includes the following requirements in

case of loss:

> 3.  Prepare an inventory of damaged property showing
>     quantity, description, actual cash value, and
>     amount of loss.  Attach all bills, receipts and
>     related documents;
> 4.  Within 60 days after the loss, send us a proof of loss,
>     which is your statement of the amount you are claiming
>     under the policy signed and sworn by you, and which
>     furnishes us with the following information:
>     a.  The date and time of loss;
>     b.  A brief explanation of how the loss happened;
>     c.  Your interest (for example, "owner") and the
>         interest, if any, of others in the damaged
>         property;
>     d.  Details of any other insurance that may cover
>         the loss;
>     e.  Changes in title or occupancy of the covered
>         property;
>     f.  Specifications of damaged buildings and
>         detailed repair estimates;
>     g.  Name of mortgages or anyone else having a
>         lien, charge, or claim against the covered
>         property;
>     h.  Details about who occupied any insured
>         building at the time of loss and for what
>         purposes; and
>     i.  The Inventory of damaged personal property
>         described in J.3. above.

     8.   In addition, Article VII(J)(6) of the SFIP requires

United States District Court
For the Northern District of California

the Cooks to "cooperate with the adjuster or representative in the investigation of the claim."

9.   According to the SFIP's Increased Cost of Compliance provision ("ICC"), the Cooks may also be entitled to recover up to $30,000 in order to perform upgrades that are necessary to comply with local flood plain management laws or regulations.  Id. art. III.D.  This $30,000, when coupled with recovery for damage to the building, cannot exceed the $250,000 policy limit.  Id. art. III.D.2.  In order to be eligible for recovery for ICC, the Cooks must meet several requirements.  The most relevant requirements are: (1) the house must have suffered damages from the flood totaling at least 50% of the value of the house, and (2) the upgrade must be required by a state or local agency for compliance with a flood management code or ordinance.  Id. art. III.D.1, 3.a.2.  Except as provided under ICC, the policy clearly excludes any costs undertaken to comply with building codes.  Id. art. V.A.6.

**C.   The House**

10.   The house is a craftsman bungalow built in 1910.  TP at 193:13-20 (test. of N. Cook).[1]  The house was valued at $350,000.00.  See Pls.' Ex. 24.

11.   The main living area is on the first floor, with two bedrooms on the second floor.  TP at 193:13-20 (test. of N. Cook).  Before the flood, the rear of the house (towards the

---

[1] "TP" refers to the Transcript of Proceedings from the trial held from April 27, 2009 to April 29, 2009.  Docket Nos. 83, 84, 87.

4

southwest) contained the kitchen, a bedroom, and an office.  <u>See</u>
Pls.' Ex. 19 ("Updegrave Site Plan") at PC00276.[2]

   12.   The second floor of the house had previously been
an attic, but had been converted to living space at some
unspecified point in the house's history. TP at 38:16-18 (test. of
Updegrave).

   13.   The house has a basement that is below grade on all
four sides.  <u>Id.</u> at 193:23-24 (test. of N. Cook).

   14.   Ross Creek runs roughly forty feet behind the
house.  <u>Id.</u> at 235:18-20.  The house is in a flood zone.  <u>Id.</u> at
217:14-16 (test. of Melham Jarjoura ("Jarjoura")).[3]  Prior to the
flood and subsequent renovations to the house, the floorboards of
the main floor sat seven inches below the base flood elevation (as
measured by a flood that occurred in 1982).  <u>Id.</u> at 107:8-21
(test. of Paul Pieri ("Pieri")).[4]

   15.   Before the Cooks purchased the house, Jeffrey
Piccinini ("Piccinini") purchased the house in 2001, in order to
fix and resell it.  <u>Id.</u> at 5:10-14 (test. of Piccinini).  Part of
his work included affixing plywood or OSB board to the cripple
wall of the house.  The cripple wall is a structure that secures
the first floor of the house to its concrete foundation, and this
cripple wall stood approximately two feet tall.  <u>Id.</u> at 6:5-7.  In
2003, Piccinini sold the house to Evan Singer ("Singer") and his

   [2] Onju Updegrave ("Updegrave") was the Cooks' architect.

   [3] Jarjoura is the building official and director of public
works for the Town of Ross.  TP at 214:16-18 (test. of Jarjoura).

   [4] Pieri was the Cooks' structural engineer.

United States District Court
For the Northern District of California

wife.  Id. at 7:8-10, 9:22-23.

16.  Around the end of June, 2005, the Cooks purchased the house from the Singers and began living in it.  TP at 192:9-10 (test. of N. Cook); Pls.' Trial Br. ("PTB") at 1.

17.  At that time, the windows and doors were functioning and could be opened and closed with ease, and the floors were level.  See TP at 185:15-24, 187:12-14 (test. of Singer).

18.  Prior to purchasing the house, the Cooks hired engineer Paul Pieri to perform a "walkthrough" and "visual assessment" of the house.  Id. at 76:10-14 (test. of Pieri).  The house was "in excellent shape in terms of finishes . . . and its upkeep" and there were no visible cracks in the wall or finishing.  Id. at 76:16-77:16.

19.  The house had several deficiencies that Pieri noted.  In particular, he found that the roof was undersupported.  Id. at 121:2-10.  "It looked like it was just built out of two-by-fours, and it should have some better structure."  Id. at 120:11-13, 121:2-10.  Some of the exposed roofing members had dry rot.  Id. at 115:24-116:4.  Updegrave also noted the "substandard roof structure."  See Updegrave Site Plans at PC00215.  Later inspection by Gary Mochizuki ("Mochizuki"), structural engineer for USAA, confirmed that "the construction was very sub par for the roof system itself in that the joists were very small and spaced very far apart. . . .  There was very little support for those joists that would carry them down to the foundation."  TP at 322:24-323:3 (test. of Mochizuki).  When the attic space had been

United States District Court
For the Northern District of California

converted to living space, supporting rafters had apparently been removed, leaving the roof with less support than before.  Id. at 323:3-324:8.

20.   In addition, the rear area of the house was a converted back porch, and a portion of this was "on a post and pad foundation," which was different from the rest of the house.  See id. at 99:7-100:12 (test. of Pieri).  The support for this portion of the house was not up to code, but there is no indication that it was structurally deficient.  Id.

**D.   The Flood**

21.   On December 31, 2005, approximately six months after the Cooks moved into the house, Ross Creek and the nearby San Anselmo Creek flooded.  Id. at 78:19-21 (test. of Pieri).

22.   The flood water started entering the basement of the house at some time between 2:00 a.m. and 3:00 a.m.  Id. at 258:1-2 (test. of S. Cook).  The water rose very rapidly, and by the time the Cooks evacuated their home around 4:00 a.m., the water outside of the house was already five inches deep.  Id. at 258:20-24, 291:5-13.

23.   The water in the basement eventually reached within an inch or two of the floorboards.  Id. at 90:16-17 (test. of Pieri); PTB at 2.

24.   The flood water was flowing to the south at approximately two to three miles per hour.  TP at 92:17-24 (test. of Pieri).

25.   By the time S. Cook returned to the house at 9:00 a.m. the following morning, most of the flood water was no longer

7

**United States District Court**
For the Northern District of California

in the basement. _Id._ at 259:13-14 (test. of S. Cook). However, water was still present in portions of the Cooks' basement (referred to as the "crawlspace") until at least January 4, 2006, as shown by an invoice from Ideal Drying, Inc., whom the Cooks hired to assist with cleanup. _See_ Pls.' Ex. 18 at 3.

  **E.** **The Condition of the House, as Noted After the Flood**

   26. After the flood, the floor of the kitchen had begun to bulge over the central beam that supported the floor from underneath, and some of the floor tiles in the kitchen had cracked. TP at 89:5-10 (test. of Pieri); Updegrave Site Plan at PC00276. A similar hump existed over the same beam towards the front of the house. _See_ Updegrave Site Plan at PC00276.

   27. Cracks began to appear in the plaster of certain areas of the house, and these cracks continued to grow over the next month or two, after which they ceased to grow. TP at 88:5-89:2 (test. of Pieri).

   28. Windows and doors in portions of the house became difficult to open and close. _Id._ at 201:12-16 (test. of N. Cook).

   29. At some point after the flood, the Cooks noticed that part of the roof was sagging. _Id._ at 200:19-201:1 (test. of N. Cook).

   30. Roughly seven months after the flood, the shingles and sheathing were removed from the sides of the house over the cripple walls. _Id._ at 20:2-11 (test. of Updegrave). This revealed that a portion of the cripple wall on the south side of the building was out of plumb; the top of the cripple wall extended approximately an inch further out than the bottom of the

1  cripple wall.  Id. at 21:5-8.

2      F.   **The Extent and Nature of the Flood Damage**

3          31.   The Cooks and USAA offer diverging theories as to

4  what occurred during the flood, and which of the house's

5  conditions were directly caused by the flood.  The Cooks contend

6  that during the flood, the house actually became buoyant, "like a

7  raft," and then was placed back down.  Pls.' Post-Trial Br. at 4;

8  TP at 92:15-24 (test. of Pieri).  The Cooks believe that this

9  floatation caused structural damage to the house.  See PTB at 3.

10 Alternatively, the Cooks argue that the house suffered structural

11 damage from the lateral force of the flood waters.  Pls.' Post-

12 Trial Br. at 15-16.  The Court finds both of these theories

13 untenable.

14         32.   Wayne Ferree ("Ferree"), a civil and structural

15 engineer with extensive experience, testified as an expert witness

16 for USAA.  TP at 433:6-438:21 (test. of Ferree).  Ferree testified

17 that because only a small portion of the house's substructure was

18 submerged during the flood (i.e., some wooden members in the

19 basement), it would have been physically impossible for the house

20 to become buoyant.  Id. at 441:12-445:18.

21         33.   Ferree's testimony also rebuts the Cooks' theory

22 that the house was damaged by the lateral force of the flood

23 water.  The primary basis for this theory was the crooked cripple

24 wall.  Pls.' Post-Trial Br. at 15-16.  Ferree testified that if

25 the cripple wall had indeed been damaged by the pressure of the

26 flood water, then some evidence of stress or wracking would have

27 appeared in other portions of the cripple wall.  TP at 446:4-451:4

28

*United States District Court*
For the Northern District of California

**United States District Court**
For the Northern District of California

(test. of Ferree).  No such signs were present, and their absence was never explained.  Id. at 446:4-451:4; id. at 326:9-327:11 (test. of Mochizuki).  The most reasonable conclusion is that the cripple wall was out of plumb prior to the flood.  Id. at 449:23-451:4 (test. of Ferree).

34.  There is no evidence that the house suffered any damage that would require replacing the structure or foundation of the house.  Id. at 326:9-327:11, 328:25-329:4 (test. of Mochizuki).

35.  Ferree testified that much of the damage that was observed after the flood occurred when portions of the house were submerged, causing the wooden frame of the house to saturate and swell.  See id. at 454:23-462:14 (test. of Ferree).  The fact that different parts of the house would swell and contract at different speeds explains the slow cracking that occurred in the walls of the house over the first month or two after the flood.  Id.  It can account, by and large, for the bulges in the floor.  Id.  Moreover, it accounts for this cosmetic damage while explaining why no significant structural damage was observed.  Id. at 469:22-470:4.  The Court agrees with Ferree's testimony as to the cause of the house's damages, and finds accordingly.

36.  There is insufficient evidence to conclude that the sag in the roof was caused directly by the flood.  Given the well-documented fact that the roof was lacking in structural support, it is probable that a sag in the roof existed prior to the flood, and that it had simply gone unnoticed.  Id. at 120:11-13, 121:2-10 (test. of Pieri); id. at 323:3-324:8 (test. of Mochizuki).  Such

conditions are common in houses of this age.  Id. at 520:9-20,
521:4-24 (test. of Ferree).

37.   The Court therefore finds that the flood caused
cracking and bulging in the house's floor, cracks in the walls
throughout the house, and damage to the doors and windows that
made them difficult to open and close.

**G.   Repairs and Renovations to the House After the Flood**

38.   After the flood, the Cooks began the process of
cleanup and reparation.  Within two weeks of the flood, the Cooks
employed Updegrave to design the restored and renovated house.
Id. at 13:20-14:8 (test. of Updegrave).

39.   The Cooks did not intend to simply repair the
damage from the flood, but sought to significantly redesign their
home, to raise it in order to protect against future flooding, and
to protect against earthquakes.  See Updegrave Site Plans at
PC00215; Def.'s Ex. 540 ("Ross Minutes"); TP at 47:22-48:10, 67:4-
68:21 (test. of Updegrave).  For example, the "substandard roof
structure" was to be repaired, the fireplace removed, the laundry
appliances moved to the main floor, and the rear kitchen/office
area demolished and replaced with a new and more secure structure.
See Updegrave Site Plans at PC00215, PC00218.  Updegrave's plans
reflected this.  Id.

40.   On May 11, the Council for the Town of Ross
considered the application for the Cooks' planned repairs and
renovations, as detailed in the Updegrave Site Plan.  See Ross
Minutes at PC00134.  The Cooks requested that the structure be
raised "to protect [the] structure[] from flooding."  Id.  The

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1  Council approved the designs, with some additional conditions.

2  <u>Id.</u> at PC00142.

3      41.   The Cooks began to repair and renovate the house,

4  in accordance with the plans that had been set down by Updegrave,

5  on or around August 4, 2006.  TP at 307:25-308:8 (test. of S.

6  Cook).

7      **H.   <u>Post-Flood Contact and Cooperation Between the Cooks and</u>
       **<u>USAA</u>**

8

9      42.   The Cooks contacted USAA to alert them of the

10  damage within twenty-four hours of the flood.  <u>Id.</u> at 261:11-15

11  (test. S. Cook).

12      43.   USAA assigned Darby Hambrick ("Hambrick"), a

13  contracted claims adjustor, to investigate the house, and he did

14  so on January 9, 2006.  <u>Id.</u> at 419:21-420:11 (test. of Hambrick).

15      44.   Hambrick concluded that the total damage to the

16  property was $13,075.47.  <u>See</u> Def.'s Ex. 4 ("Hambrick Report").

17  This included the cost of cleaning, water extraction, duct work,

18  rewiring, and the replacement of a water heater, furnace, a

19  clothes washer and a dryer.  <u>Id.</u> at PC00182-83.  This amounted to

20  only $8075.47 after the $5000.00 deductible was subtracted.

21      45.   On February 20, 2006, USAA issued a check for

22  $8075.47 to the Cooks.  Def.'s Trial Br. ("DTB") at 3; TP at

23  304:6-9 (test. of S. Cook).

24      46.   In mid-February of 2006, Kevin Bushaw ("Bushaw"), a

25  general adjustor who works directly for USAA, was assigned to the

26  Cooks' case.  TP at 263:3-8 (test. of S. Cook); <u>id.</u> at 344:19-24

27  (test. of Bushaw).

28

12

United States District Court
For the Northern District of California

47.   Bushaw inspected the property on February 28, 2006. Id. at 346:23-347:1 (test. of Bushaw).   Pieri also attended this inspection, and Bushaw received a copy of a letter from Pieri to the Cooks that outlined Pieri's assessment of the damages and their likely cause.   Id. at 347:8-348:12.

48.   Pieri's report indicated that Pieri believed "the house may have experienced a few inches of settlement during the saturated state of the ground soil . . . ," Def.'s Ex. 505 ("First Pieri Letter") at 2, but Pieri later disavowed this theory, see TP at 81:23-83:1 (test. of Pieri).

49.   On May 11, 2006, USAA issued another check to the Cooks for $4180.32, as supplemental payment for cleanup performed by Ideal Cleaning.   Def.'s Ex. 508 ("May 11 Letter") at 1.

50.   Also on May 11, 2006, Bushaw and S. Cook spoke over the phone.   See Def.'s Ex. 535 ("Bushaw Case Journal") at PC00425. The conversation included discussion of the Cooks' renovation plans, although S. Cook apparently did not state the date on which the renovations would begin.   Id.

51.   Bushaw again visited the house on June 30, 2006. See Def.'s Ex. 509; TP at 307:6-17 (test. of S. Cook).   S. Cook provided him with updates, and Bushaw informed her that USAA would need an opportunity to review and consider further engineering inspections before work was done to the house.   Def.'s Ex. 509; TP at 307:6-17 (test. of S. Cook).

52.   Bushaw did not have much contact with the Cooks throughout the later part of July, during which he took a two-week vacation.   See Bushaw Case Journal at PC00427.

**United States District Court**
For the Northern District of California

53.   On July 24, 2006, the Cooks sent another letter and an "Additional Proof of Claim" to Bushaw, further explaining and itemizing the damage to their house, and including additional receipts for expenses.   See Def.'s Ex. 510 ("July 24 Letter").

54.   The July 24 Letter also stated that the Cooks planned to begin repairs and renovations to the house at some point on the following week, on or around August 4, 2006.   Id. at PC00120-21.

55.   Upon return from his vacation on July 31, Bushaw received the Cooks' July 24 letter.   See Bushaw Case Journal at PC00428.   He began to look for an engineer who was available to inspect the property before the renovations began.   Id.

56.   Bushaw and Mochizuki, a structural engineer hired by USAA, inspected the house on August 4, 2006.   TP at 320:5-25 (test. of Mochizuki).   By the time they arrived, the side paneling had been removed from the cripple wall, the roof was being torn off, and demolition had begun on the rear portion of the house. Id. at 322:18-23, 325:4-11; 327:19-21.

57.   Mochizuki issued a report indicating that it was "highly unlikely" that the flood caused any structural damage to the house.   Def.'s Ex. 514 ("Mochizuki Report") at 4.

58.   On August 7, 2006, Bushaw sent a letter to the Cooks, stating that USAA was rejecting the Proof of Claim because it still required pre-loss inspection reports, sales documentation, and additional data from their engineer that had previously been requested.   See Def.'s Ex. 511 at 1.

59.   On October 16, 2006, USAA issued the Cooks another

14

United States District Court

For the Northern District of California

payment of $12,126.11, for supplemental "repair costs for the electrical, furnace and water mitigation expenses."  Def.'s Ex. 516 ("October 16 Letter").

60.   On December 22, 2006, the Cooks completed a proof of loss form ("December 22 Proof of Loss"), which they thereafter submitted to USAA, requesting a total of $220,039.73 for damage allegedly caused by the flood.  Pls.' Ex. 9.

61.   USAA denied the Cooks' December 22 Proof of Loss. See Def.'s Ex. 519.

62.   Throughout the months after the flood, the Cooks were in frequent contact with USAA.  See generally Bushaw Case Journal.

63.   Although the Cooks were unable to respond to many of USAA's requests for information and were often slow in their responses, they provided what they could and explained why certain requested information could not be provided.  TP at 265:10-267:9, 305:17-20 (test. of S. Cook).

64.   In total, USAA has issued the Cooks $24,381.00 for damage to the house and cleanup, and the SFIP's $5000 deductible has been exhausted.  See May 11 Letter; October 16 Letter; DTB at 3; TP at 304:6-9 (test. of S. Cook).

65.   Per stipulation by the parties, submission of the Cooks' proof of loss was timely.  See Stipulation re Pls.' Timely Presenting Flood Insurance Proof of Loss ("Stip."), Docket No. 59.

**I.   The Cooks' Claim for Damaged Personal Property**

66.   When Hambrick visited the Cooks' property on January 9, 2006, he found that there was $2098.00 worth of damage

15

to personal property that the Cooks had stored in the basement (including a washer and a dryer).   See Hambrick Report at PC00183. This fell below the $5000 deductible.

67.   USAA never received an itemized claim for personal property from the Cooks.   TP at 378:17-24 (test. of Bushaw); Def.'s Ex. 518.

68.   There is insufficient evidence to support a finding that the Cooks ever submitted an itemized claim for damaged personal property to USAA.   S. Cook claims that in the later part of 2006, she sent Bushaw an inventory of damaged personal property totaling $12,475.   Id. at 271:8-17, 289:10-290:22, 295:12-16 (test. of S. Cook).   However, she offered no evidence to support this claim at trial.   She did not keep a record of any correspondence related to the content claim, she does not have the file that she used to originally generate the content claim, and she has never recreated the itemized list of damaged personal property.   Id. at 289:10-290:22.

**III.   CONCLUSIONS OF LAW**

The elements of a cause of action for breach of contract are: (1) the existence of the contract; (2) performance by the plaintiff or excuse for nonperformance; (3) breach by the defendant; and (4) damages.   First Commercial Mortgage Co. v. Reece, 89 Cal. App. 4th 731, 745 (Ct. App. 2001).   "[W]hile insurance contracts have special features, they are still contracts to which the ordinary rules of contractual interpretation apply."   La Jolla Beach & Tennis Club, Inc. v. Indus. Indem. Co., 9 Cal. 4th 27, 37 (1995) (citations omitted);

United States District Court
For the Northern District of California

16

United States District Court
For the Northern District of California

1   see also Conestoga Servs. Corp. v. Exec. Risk Indem., 312 F.3d

2   976, 981 (9th Cir. 2002) (citing La Jolla Beach).

3       Both parties agree that there was a contract between the

4   Cooks and USAA, and the terms of that contract were controlled by

5   the SFIP.  See DTB at 2; PTB at 1.  "The law is clear that, as

6   contracts, SFIPs issued under the [NFIP] are governed by federal

7   law applying standard insurance law principles."  McHugh v. United

8   Serv. Auto. Ass'n, 164 F.3d 451, 454 (9th Cir. 1999).  "Federal

9   law has long recognized that an insured must comply strictly with

10  the terms and conditions of a federal insurance policy" in order

11  to recover under the SFIP.  Flick v. Liberty Mut. Fire Ins. Co.,

12  205 F.3d 386, 392 (9th Cir. 2000) (citing Federal Crop Ins. Corp.

13  v. Merrill, 332 U.S. 380, 384-85 (1947)).  This is because WYO

14  insurers (such as USAA) typically must "draw funds from the

15  National Flood Insurance Fund to pay losses under standard flood

16  insurance policies."  Id. at 394.  Consequently, any recovery in a

17  suit against USAA would be a draw upon the public treasury, and

18  strict compliance with the terms of the SFIP is necessary to

19  ensure that the judiciary does not authorize expenditures that

20  have not been specifically authorized by Congress.  See Id. at

21  391.

22      **A.   Performance by the Cooks**

23      USAA argues that the Cooks failed to comply with the terms of

24  the SFIP, and therefore cannot recover anything under the policy.

25  Def.'s Post-Trial Br. at 4-5.  USAA offers two grounds for finding

26  that the Cooks failed to comply.  First, USAA asserts that the

27  Cooks failed to cooperate with USAA as required by Article

28

17

United States District Court
For the Northern District of California

VII(J)(6) of the SFIP.  Id. at 5-6.  Second, USAA claims that the
Cooks' proof of loss was insufficient, per the requirements set
out in Article VII(J)(3) and (4).  Id. at 6-7.

          1.   The Cooks' Cooperation with USAA

    Under Article VII(J)(6) of the SFIP, the insured "must
cooperate with the adjuster or representative in the investigation
of the claim."  USAA offers a number of instances of alleged non-
cooperation in support of its contention that this provision
prohibits recovery by the Cooks.  Def.'s Post-Trial Br. at 4-5.

    First, USAA alleges that the Cooks failed to heed USAA's
repeated requests for information.  Id.  As previously noted, the
Court recognizes that the Cooks were often slow to respond to
USAA's requests, and could not submit all of the information that
USAA requested.  However, the Cooks maintained frequent contact
with USAA, see generally Bushaw Case Journal, and the Cooks' have
testified regarding their good-faith efforts to provide USAA the
requested information.  See TP at 265:10-267:9 (test. of S. Cook).
The Court finds this testimony credible.

    Second, USAA claims that the Cooks gave USAA insufficient
time to inspect the house.  Def.'s Post-Trial Br. at 5.  By a
letter dated July 24, 2006, the Cooks first notified USAA that
renovations to the house would begin in the first week of August.
See July 24 Letter at PC00120-21.  However, the Cooks had
previously communicated to Bushaw their intent to do work on the
house, and had indicated their willingness to allow USAA's agents
to inspect the property.  See Bushaw Case Journal at PC00425,
PC00427.  Although there was only a short period between the July

24 Letter and the time that the renovations began, it is not clear why USAA did not get an engineer to inspect the site in the seven-month period between the flood and the time of the renovation. Moreover, the Court notes that the July 24 Letter was sufficient to allow USAA's engineer to inspect the property. The Court finds that the Cooks have met their contractual obligation to cooperate with USAA pursuant to Article VII(J)(6) of the SFIP.

>  2.  <u>The Sufficiency of the Cooks' Proof of Loss</u>

Article VII(J) of the SFIP requires the insured to provide certain documents in case of loss. Article VII(J)(3) requires the insured to "[p]repare an inventory of damaged property" that specifically describes the quantity and value of the personal property lost. Article VII(J)(4) requires the insured to submit a proof of loss, describing the events causing the loss, along with descriptions of the insured's interest in the property, "[s]pecifications of damaged buildings and detailed repair estimates," etc.[5]

USAA contends that the Cooks' submissions fail to meet these requirements. Def.'s Post-Trial Br. at 6-7. This argument is primarily directed towards the sufficiency of the Cooks' claim for their damaged personal property (i.e., the contents of the house, rather than the house itself). <u>Id.</u> In this regard, the Court

---

[5] As previously noted, Article VII(J)(4) of the SFIP requires the proof of loss to be submitted within sixty days of the loss. Parties have stipulated that the Cooks' proof of loss was timely. <u>See</u> Stip. The attorney for the Cooks has represented to the Court that this late filing was possible because the Federal Flood Insurance Administration has waived the sixty-day deadline, extending it to one year. PTB at 6.

United States District Court
For the Northern District of California

agrees with USAA.  The Cooks have not established that they ever sent USAA an inventory of damaged personal property as required by Article VII(J)(3).  USAA never received it.  See TP at 378:17-24 (test. of Bushaw).  Even if the Court were to accept the Cooks' claim that they sent an inventory to USAA, the Cooks' failure to provide the Court with a copy of the inventory, or to even attempt to recreate the inventory, undermines the Court's ability to evaluate whether the specific requirements of Article VII(J)(3) were met.  Without the inventory of damaged property, USAA cannot issue any payment on the Cooks' personal property claim.  See Flick, 205 F.3d at 394-95 (requiring strict compliance to SFIP terms before payment can be authorized).

USAA also suggests, in a footnote, that the Cooks' proof of loss as to the house does not meet the requirements of these provisions.  Def.'s Post-Trial Br. at 6 n.4.  USAA does not specify how the proof of loss is insufficient.  The greatest potential deficiency that the Court can identify is the lack of a "detailed repair estimate," as required by Article VII(J)(3).  The Cooks submitted to USAA an estimate prepared by Calder Custom Building, which broadly covered most of the work described by Updegrave's building plans and renovations, rather than just the work needed to repair the damage from the flood.  See July 24 Letter at PC00132-33.  USAA points out that this estimate differs from the estimate prepared by Nicholas Calder ("Calder") for litigation, which addresses only the hypothetical repairs that would be needed to fix flood damage, without the additional costs of renovation and structural upgrades.  Pls.' Ex. 23 ("Second

**United States District Court**
For the Northern District of California

Calder Estimate"); TP at 159:6-23 (test. of Calder). This difference is immaterial to the question of whether the Cooks' submissions were sufficient under the SFIP. The SFIP calls only for "detailed repair estimates," and does not forbid insureds from submitting estimates that include repairs beyond the scope of the flood damage. SFIP art. VII(J)(3). By an attached letter, and by a later proof of loss, the Cooks described which portions of the original Calder estimate they were claiming as repairs for flood damage. <u>See</u> July 24 Letter at PC00124; Dec. 22 Proof of Loss at PC00023. The Court finds that the December 22 Proof of Loss, coupled with the information provided by the Cooks over 2006, fully meets the requirements of Article VII(J)(4).

### B. **Breach by USAA**

USAA is obligated to pay the Cooks "for direct physical loss by or from flood." SFIP art. I, III.A. The Cooks have complied with the SFIP with respect to their claim for damage to their house. The Cooks have established that the flood directly caused damage to the floor, windows and doors, and the walls of the house, although they have not proved that the house's structural integrity has been damaged. As previously discussed, USAA has only reimbursed the Cooks for the cost of cleaning, water extraction, duct work, electrical work, and the replacement of a water heater, furnace, a clothes washer and a dryer. Because USAA has not yet issued the Cooks any money to cover the floor, windows and doors, and walls of the house, USAA is in breach of the SFIP.

### C. **Damages**

The only question is how much it would cost to repair the

floors, walls, doors and windows that were damaged by the flood. The Cooks have not received any reimbursement for this damage. The Cooks have not shown that they are entitled to any additional payment for those items that were the subject of previous payments issued by USAA. For example, the Cooks have not argued that they are entitled to any additional payment for damage to their HVAC unit, which was covered by the first and third payments issued by USAA. See Hambrick Report at PC00182; July 24 Letter at PC00122-24; October 16 Letter at 1.

The Cooks and USAA have each submitted damage estimates that, predictably, differ by large amounts. Both damage estimates have a number of deficiencies, and strict adherence to either is unwarranted. First, the Cooks have submitted the Second Calder Estimate, which estimates flood damages of $219,126.00. When the Calder estimate is stripped down to unreimbursed items that the Court has found to be damaged by the flood, it totals $49,400.00 (excluding additional fees).[6] See Second Calder Estimate. However, this figure is still too broad. This is because the Second Calder Estimate assumes a scope of flood damage that is broader than what the Court has found, and it is not thoroughly itemized. For example, when Calder provides a figure for "Doors and Windows," the figure includes the cost of replacing all windows in the rear section of the house, even though these windows were not sticking or defective after the flood. See TP at 175:15-173:24 (test. of Calder); Updegrave Site Plan at PC00276.

---

[6] This includes the cost of doors and windows, paint, gypsum wallboard, tile floors, hardwood floors, and interior trim.

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

Calder planned to replace them because he assumed that the flood had caused structural damage to the house, and so he planned to demolish and rebuild the entire rear section of the house. TP at 172:20-173:17 (test. of Calder). The Court has concluded otherwise, and finds no reason to demolish the rear or replace the rear windows. Similarly, the Second Calder Estimate has a single figure for "Paint (interior and exterior)," but given the Court's findings, it is unclear whether any exterior paint would be necessary to repair the flood damage.

USAA has submitted an estimate by contractor Patrick Kelley ("Kelley"). Def.'s Ex. 531 ("Kelley Estimate"). The Kelley Estimate totals $65,816.25. When the Kelley Estimate is stripped down to the items that the Court has found to have been damaged by the flood, it totals only $15,155.00 (excluding additional costs).[7] Kelley Estimate at 2. The Kelley Estimate does not include repairs for certain items that were damaged by the flood, including the floors and the cracked floor tiling. See TP at 552:13-15 (test. of Kelley). This number also fails to fully account for the high quality of materials throughout the house. TP at 123:3-8 (test. of Pieri). In particular, the Cooks provided expert testimony that the plaster in the house was such that the cracks could not merely be patched, and would need to be replaced with sheetrock. Id. at 102:18-103:2. Moreover, much of the house's interior custom trim was sheered, id. at 38:20-24 (test. of Updegrave), and it is not clear which item in the Kelley

_____

[7] This includes the cost for all "Interior Repairs." Kelley Estimate at 2.

Estimate would cover the cost of repairing this trim.

The Court finds the following damage estimates to be the most appropriate, in light of its findings of fact:

Paint: $6584.80[8]

Gypsum Wallboard: $6000.00[9]

Tile floors:    $5000.00[10]

Refinish hardwood floors:  $3400.00[11]

Interior trim:  $8000.00[12]

Windows and doors:  $5121.00[13]

In addition, Kelley estimated that if the house was not releveled and the bulge in the floor persisted after the floors were fixed, it would cost as much as $3000.00 to adjust the post in the basement to remove the bulge.  TP at 555:11-20 (test. of Kelley).

---

[8] See Kelley Estimate at 2.  The Court finds this figure to be the most accurate because it does not include exterior paint, as the Second Calder Estimate does.  The Cooks contend that they must be reimbursed for the cost of Benjamin Moore "Aura Paint Series," which they claim is one of the most expensive paints on the market. See Pls.' Post-Trial Br. at 9.  However, the record does not contain evidence of the type of paint used in the Cooks' house. Moreover, Kelley testified that the Kelly Moore paint used as the basis for his cost estimate is "every bit as comparable in terms of quality as Benjamin Moore."  TP at 554:1-10.

[9] See Second Calder Estimate.

[10] Id.

[11] Id.

[12] Id.

[13] See Kelley Estimate at 2.  The Court uses this figure because it does not include window replacement in the rear of the house.  The Cooks have not established that these windows were damaged directly by the flood.

24

**United States District Court**
For the Northern District of California

1   All of the above repairs would cost a total of $37,105.80.

2   After additional costs are incorporated, the total cost of repairs

3   would be $52,690.24.[14]  This is exclusive of the payment for other

4   types of damage, totaling $24,381.00, that the Cooks have already

5   received from USAA.

6   **D.   The ICC Provision**

7       The ICC provision allows insureds to recover an additional

8   $30,000.00 under the policy in order to make certain upgrades that

9   are necessary to comply with local flood plain management laws or

10  regulations.  SFIP art. III.D.  For the Cooks to be entitled to

11  payment under this provision, damage from the flood must have

12  totaled at least 50% of the value of the house, and the upgrade

13  must be required by a state or local agency for compliance with a

14  flood management code or ordinance.  Id.  The house was valued at

15  $350,000.00, see Pls.' Ex. 24, so the house would need to incur at

16  least $175,000.00 worth of flood damage for the ICC provision to

17  apply.  The Court has concluded that the flood caused a total of

18  $52,690.24 worth in damage to the floors, walls, windows and doors

19  of the house, plus another $24,381.00 worth in damage to other

20  parts of the house, for which the Cooks have already been

21

22  [14] Kelley and Calder both applied different methods for
determining additional costs, such as overhead, profit, supervision

23  and cleanup.  The Court adopts Kelley's method, as set out in his
estimate, which uses a simple percentage formula to estimate these

24  fees.  See Kelley Estimate at 4.  The Court notes that Calder's
method for calculating these costs (a flat $5000 for supervision,

25  $3500 for cleanup, and then an additional 18% for profit and
overhead) would amount to less than $1000 more than Kelley's

26  method.  The Court declines to use Calder's method, as it is
unclear whether supervision and cleanup fees would remain at the

27  higher flat price that he cites, given the narrower scope of the
project.

28

reimbursed, plus the $5000 deductible.   This totals $82,071.24,
which is well below the level of damage necessary to trigger the
ICC provision.   The Court therefore finds that the Cooks are not
entitled to recover any money under the ICC provision.

**IV.   <u>CONCLUSION</u>**

For the foregoing reasons, the Court concludes that USAA is
obligated under the SFIP to issue the Cooks an additional payment
of $52,690.24 for damage to their house that was caused directly
by the flood.


IT IS SO ORDERED.


Dated: June 1, 2009

_____
UNITED STATES DISTRICT JUDGE